Dolly M. E. FILARTIGA and Joel Filartiga, Plaintiffs-Appellants,

v.

Americo Norberto PENA–IRALA, Defendant-Appellee.

No. 191, Docket 79–6090.

United States Court of Appeals, Second Circuit.

Argued Oct. 16, 1979.

Decided June 30, 1980.

Peter Weiss, New York City (Rhonda Copelon, John Corwin and Jose Antonio Lugo, Center for Constitutional Rights, New York City, and Michael Maggio, Goren & Maggio, Washington, D. C., of counsel), for plaintiffs-appellants.

Murry D. Brochin, Newark, N. J. (Lowenstein, Sandler, Brochin, Kohl, Fisher & Boylan, P. C., Newark, N. J., of counsel), for defendant-appellee.

Irving Gornstein, Atty., Dept. of Justice, Washington, D. C. (Drew S. Days, III, Asst. Atty. Gen., John E. Huerta, Deputy Asst. Atty. Gen., Roberts B. Owen, Legal Advisor, William T. Lake, Deputy Legal Advisor, Stefan A. Riesenfeld, Charles Runyon and Linda A. Baumann, Attys., Dept. of State, Washington, D. C.), for the U. S. as amicus curiae.

Donald L. Doernberg, New York City, and David S. Weissbrodt, Minneapolis, Minn., for Amnesty International-U. S. A., Intern. League for Human Rights, and the Lawyers' Committee for Intern. Human Rights as amici curiae.

Allan Abbot Tuttle, and Steven M. Schneebaum, Washington, D. C., for The Intern. Human Rights Law Group, The Council on Hemispheric Affairs and the Washington Office on Latin America as amici curiae.

Before FEINBERG, Chief Judge, KAUFMAN and KEARSE *, Circuit Judges.

IRVING R. KAUFMAN, Circuit Judge:

Upon ratification of the Constitution, the thirteen former colonies were fused into a single nation, one which, in its relations with foreign states, is bound both to observe and construe the accepted norms of international law, formerly known as the law of nations. Under the Articles of Confederation, the several states had interpreted and applied this body of doctrine as a

* The late Judge Smith was a member of the original panel in this case. After his unfortunate death, Judge Kearse was designated to fill his place pursuant to Local Rule § 0.14(b).

part of their common law, but with the founding of the "more perfect Union" of 1789, the law of nations became preeminently a federal concern.

Implementing the constitutional mandate for national control over foreign relations, the First Congress established original district court jurisdiction over "all causes where an alien sues for a tort only [committed] in violation of the law of nations." Judiciary Act of 1789, ch. 20, § 9(b), 1 Stat. 73, 77 (1789), *codified at* 28 U.S.C. § 1350. Construing this rarely-invoked provision, we hold that deliberate torture perpetrated under color of official authority violates universally accepted norms of the international law of human rights, regardless of the nationality of the parties. Thus, whenever an alleged torturer is found and served with process by an alien within our borders, § 1350 provides federal jurisdiction. Accordingly, we reverse the judgment of the district court dismissing the complaint for want of federal jurisdiction.

### I

The appellants, plaintiffs below, are citizens of the Republic of Paraguay. Dr. Joel Filartiga, a physician, describes himself as a longstanding opponent of the government of President Alfredo Stroessner, which has held power in Paraguay since 1954. His daughter, Dolly Filartiga, arrived in the United States in 1978 under a visitor's visa, and has since applied for permanent political asylum. The Filartigas brought this action in the Eastern District of New York against Americo Norberto Pena-Irala (Pena), also a citizen of Paraguay, for wrongfully causing the death of Dr. Filartiga's seventeen-year old son, Joelito. Because the district court dismissed the action for want of subject matter jurisdiction, we must accept as true the allegations contained in the Filartigas' complaint and affidavits for purposes of this appeal.

The appellants contend that on March 29, 1976, Joelito Filartiga was kidnapped and tortured to death by Pena, who was then Inspector General of Police in Asuncion, Paraguay. Later that day, the police brought Dolly Filartiga to Pena's home where she was confronted with the body of her brother, which evidenced marks of severe torture. As she fled, horrified, from the house, Pena followed after her shouting, "Here you have what you have been looking for for so long and what you deserve. Now shut up." The Filartigas claim that Joelito was tortured and killed in retaliation for his father's political activities and beliefs.

Shortly thereafter, Dr. Filartiga commenced a criminal action in the Paraguayan courts against Pena and the police for the murder of his son. As a result, Dr. Filartiga's attorney was arrested and brought to police headquarters where, shackled to a wall, Pena threatened him with death. This attorney, it is alleged, has since been disbarred without just cause.

During the course of the Paraguayan criminal proceeding, which is apparently still pending after four years, another man, Hugo Duarte, confessed to the murder. Duarte, who was a member of the Pena household,[1] claimed that he had discovered his wife and Joelito *in flagrante delicto*, and that the crime was one of passion. The Filartigas have submitted a photograph of Joelito's corpse showing injuries they believe refute this claim. Dolly Filartiga, moreover, has stated that she will offer evidence of three independent autopsies demonstrating that her brother's death "was the result of professional methods of torture." Despite his confession, Duarte, we are told, has never been convicted or sentenced in connection with the crime.

In July of 1978, Pena sold his house in Paraguay and entered the United States under a visitor's visa. He was accompanied by Juana Bautista Fernandez Villalba, who had lived with him in Paraguay. The couple remained in the United States beyond the term of their visas, and were living in

---

1. Duarte is the son of Pena's companion, Juana Bautista Fernandez Villalba, who later accompanied Pena to the United States.

Brooklyn, New York, when Dolly Filartiga, who was then living in Washington, D. C., learned of their presence. Acting on information provided by Dolly the Immigration and Naturalization Service arrested Pena and his companion, both of whom were subsequently ordered deported on April 5, 1979 following a hearing. They had then resided in the United States for more than nine months.

Almost immediately, Dolly caused Pena to be served with a summons and civil complaint at the Brooklyn Navy Yard, where he was being held pending deportation. The complaint alleged that Pena had wrongfully caused Joelito's death by torture and sought compensatory and punitive damages of $10,000,000. The Filartigas also sought to enjoin Pena's deportation to ensure his availability for testimony at trial.[2] The cause of action is stated as arising under "wrongful death statutes; the U. N. Charter; the Universal Declaration on Human Rights; the U. N. Declaration Against Torture; the American Declaration of the Rights and Duties of Man; and other pertinent declarations, documents and practices constituting the customary international law of human rights and the law of nations," as well as 28 U.S.C. § 1350, Article II, sec. 2 and the Supremacy Clause of the U. S. Constitution. Jurisdiction is claimed under the general federal question provision, 28 U.S.C. § 1331 and, principally on this appeal, under the Alien Tort Statute, 28 U.S.C. § 1350.[3]

Judge Nickerson stayed the order of deportation, and Pena immediately moved to dismiss the complaint on the grounds that subject matter jurisdiction was absent and for *forum non conveniens.* On the jurisdictional issue, there has been no suggestion that Pena claims diplomatic immunity from suit. The Filartigas submitted the affidavits of a number of distinguished international legal scholars, who stated unanimously that the law of nations prohibits absolutely the use of torture as alleged in the complaint.[4] Pena, in support of his motion to dismiss on the ground of *forum non conveniens,* submitted the affidavit of his Paraguayan counsel, Jose Emilio Gorostiaga, who averred that Paraguayan law provides a full and adequate civil remedy for the wrong alleged.[5] Dr. Filartiga has not

2. Several officials of the Immigration and Naturalization Service were named as defendants in connection with this portion of the action. Because Pena has now been deported, the federal defendants are no longer parties to this suit, and the claims against them are not before us on this appeal.

3. Jurisdiction was also invoked pursuant to 28 U.S.C. §§ 1651, 2201 & 2202, presumably in connection with appellants' attempt to delay Pena's return to Paraguay.

4. Richard Falk, the Albert G. Milbank Professor of International Law and Practice at Princeton University, and a former Vice President of the American Society of International Law, avers that, in his judgment, "it is now beyond reasonable doubt that torture of a person held in detention that results in severe harm or death is a violation of the law of nations." Thomas Franck, professor of international law at New York University and Director of the New York University Center for International Studies offers his opinion that torture has now been rejected by virtually all nations, although it was once commonly used to extract confessions. Richard Lillich, the Howard W. Smith Professor of Law at the University of Virginia School of Law, concludes, after a lengthy review of the authorities, that officially perpetrated torture is "a violation of international law (formerly called the law of nations)." Finally, Myres MacDougal, a former Sterling Professor of Law at the Yale Law School, and a past President of the American Society of International Law, states that torture is an offense against the law of nations, and that "it has long been recognized that such offenses vitally affect relations between states."

5. The Gorostiaga affidavit states that

a father whose son has been wrongfully killed may in addition to commencing a criminal proceeding bring a civil action for damages against the person responsible. Accordingly, Mr. Filartiga has the right to commence a civil action against Mr. Duarte and Mr. Pena-Irala since he accuses them both of responsibility for his son's death. He may commence such a civil action either simultaneously with the commencement of the criminal proceeding, during the time that the criminal proceeding lasts, or within a year after the criminal proceeding has terminated. In either event, however, the civil action may not proceed to judgment until the criminal proceeding has been disposed of. If the defendant is found not guilty because he was not the author of the case under investigation

commenced such an action, however, believing that further resort to the courts of his own country would be futile.

Judge Nickerson heard argument on the motion to dismiss on May 14, 1979, and on May 15 dismissed the complaint on jurisdictional grounds.[6] The district judge recognized the strength of appellants' argument that official torture violates an emerging norm of customary international law. Nonetheless, he felt constrained by dicta contained in two recent opinions of this Court, *Dreyfus v. von Finck*, 534 F.2d 24 (2d Cir.), *cert. denied*, 429 U.S. 835, 97 S.Ct. 102, 50 L.Ed.2d 101 (1976); *IIT v. Vencap, Ltd.*, 519 F.2d 1001 (2d Cir. 1975), to construe narrowly "the law of nations," as employed in § 1350, as excluding that law which governs a state's treatment of its own citizens.

The district court continued the stay of deportation for forty-eight hours while appellants applied for further stays. These applications were denied by a panel of this Court on May 22, 1979, and by the Supreme Court two days later. Shortly thereafter, Pena and his companion returned to Paraguay.

## II

■ Appellants rest their principal argument in support of federal jurisdiction upon the Alien Tort Statute, 28 U.S.C. § 1350, which provides: "The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." Since appellants do not contend that their action arises directly under a treaty of the United States,[7] a threshold question on the jurisdictional issue is whether the conduct alleged violates the law of nations. In light of the universal condemnation of torture in numerous international agreements, and the renunciation of torture as an instrument of official policy by virtually all of the nations of the world (in principle if not in practice), we find that an act of torture committed by a state official against one held in detention violates established norms of the international law of human rights, and hence the law of nations.

■ The Supreme Court has enumerated the appropriate sources of international law. The law of nations "may be ascertained by consulting the works of jurists, writing professedly on public law; or by the general usage and practice of nations; or by judicial decisions recognizing and enforcing that law." *United States v. Smith*, 18 U.S. (5 Wheat.) 153, 160–61, 5 L.Ed. 57 (1820); *Lopes v. Reederei Richard Schroder*, 225 F.Supp. 292, 295 (E.D.Pa.1963). In *Smith*, a statute proscribing "the crime of piracy [on the high seas] as defined by the law of nations," 3 Stat. 510(a) (1819), was held sufficiently determinate in meaning to afford the basis for a death sentence. The *Smith* Court discovered among the works of Lord Bacon, Grotius, Bochard and other commentators a genuine consensus that rendered the crime "sufficiently and constitutionally defined." *Smith, supra*, 18 U.S. (5 Wheat.) at 162, 5 L.Ed. 57.

*The Paquete Habana*, 175 U.S. 677, 20 S.Ct. 290, 44 L.Ed. 320 (1900), reaffirmed that

> where there is no treaty, and no controlling executive or legislative act or judicial decision, resort must be had to the customs and usages of civilized nations; and, as evidence of these, to the works of jurists and commentators, who by years of labor, research and experience, have made themselves peculiarly well acquainted with the subjects of which they

---

in the criminal proceeding, no civil action for indemnity for damages based upon the same deed investigated in the criminal proceeding, can prosper or succeed.

**6.** The court below accordingly did not consider the motion to dismiss on *forum non conveniens* grounds, which is not before us on this appeal.

**7.** Appellants "associate themselves with" the argument of some of the *amici curiae* that their claim arises directly under a treaty of the United States, Brief for Appellants at 23 n.*, but nonetheless primarily rely upon treaties and other international instruments as evidence of an emerging norm of customary international law, rather then independent sources of law.

treat. Such works are resorted to by judicial tribunals, not for the speculations of their authors concerning what the law ought to be, but for trustworthy evidence of what the law really is.

*Id.* at 700, 20 S.Ct. at 299. Modern international sources confirm the propriety of this approach.[8]

■ *Habana* is particularly instructive for present purposes, for it held that the traditional prohibition against seizure of an enemy's coastal fishing vessels during wartime, a standard that began as one of comity only, had ripened over the preceding century into "a settled rule of international law" by "the general assent of civilized nations." *Id.* at 694, 20 S.Ct. at 297; *accord, id.* at 686, 20 S.Ct. at 297. Thus it is clear that courts must interpret international law not as it was in 1789, but as it has evolved and exists among the nations of the world today. *See Ware v. Hylton,* 3 U.S. (3 Dall.) 198, 1 L.Ed. 568 (1796) (distinguishing between "ancient" and "modern" law of nations).

The requirement that a rule command the "general assent of civilized nations" to become binding upon them all is a stringent one. Were this not so, the courts of one nation might feel free to impose idiosyncratic legal rules upon others, in the name of applying international law. Thus, in *Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964), the Court declined to pass on the validity of the Cuban government's expropriation of a foreign-owned corporation's assets, noting the sharply conflicting views on the issue propounded by the capital-exporting, capital-importing, socialist and capitalist nations. *Id.* at 428–30, 84 S.Ct. at 940–41.

The case at bar presents us with a situation diametrically opposed to the conflicted state of law that confronted the *Sabbatino* Court. Indeed, to paraphrase that Court's statement, *id.* at 428, 84 S.Ct. at 940, there are few, if any, issues in international law today on which opinion seems to be so united as the limitations on a state's power to torture persons held in its custody.

The United Nations Charter (a treaty of the United States, *see* 59 Stat. 1033 (1945)) makes it clear that in this modern age a state's treatment of its own citizens is a matter of international concern. It provides:

With a view to the creation of conditions of stability and well-being which are necessary for peaceful and friendly relations among nations . . . the United Nations shall promote . . . universal respect for, and observance of, human rights and fundamental freedoms for all without distinctions as to race, sex, language or religion.

*Id.* Art. 55. And further:

All members pledge themselves to take joint and separate action in cooperation with the Organization for the achievement of the purposes set forth in Article 55.

*Id.* Art. 56.

While this broad mandate has been held not to be wholly self-executing, *Hitai v. Immigration and Naturalization Service,* 343 F.2d 466, 468 (2d Cir. 1965), this obser-

8. The Statute of the International Court of Justice, Arts. 38 & 59, June 26, 1945, 59 Stat. 1055, 1060 (1945) provides:

> Art. 38
> 1. The Court, whose function is to decide in accordance with international law such disputes as are submitted to it, shall apply:
> (a) international conventions, whether general or particular, establishing rules expressly recognized by the contesting states;
> (b) international custom, as evidence of a general practice accepted as law;
> (c) the general principles of law recognized by civilized nations;
> (d) subject to the provisions of Article 59, judicial decisions and the teachings of the most highly qualified publicists of the various nations, as subsidiary means for the determination of the rules of law.
> 2. This provision shall not prejudice the power of the Court to decide a case *ex aequo et bono*, if the parties agree thereto.
> Art. 59
> The decision of the Court has no binding force except between the parties and in respect of that particular case.

vation alone does not end our inquiry.[9] For although there is no universal agreement as to the precise extent of the "human rights and fundamental freedoms" guaranteed to all by the Charter, there is at present no dissent from the view that the guaranties include, at a bare minimum, the right to be free from torture. This prohibition has become part of customary international law, as evidenced and defined by the Universal Declaration of Human Rights, General Assembly Resolution 217 (III)(A) (Dec. 10, 1948) which states, in the plainest of terms,

"no one shall be subjected to torture."[10] The General Assembly has declared that the Charter precepts embodied in this Universal Declaration "constitute basic principles of international law." G.A.Res. 2625 (XXV) (Oct. 24, 1970).

Particularly relevant is the Declaration on the Protection of All Persons from Being Subjected to Torture, General Assembly Resolution 3452, 30 U.N. GAOR Supp. (No. 34) 91, U.N.Doc. A/1034 (1975), which is set out in full in the margin.[11] The Declaration

**9.** We observe that this Court has previously utilized the U.N. Charter and the Charter of the Organization of American States, another non-self-executing agreement, as evidence of binding principles of international law. *United States v. Toscanino*, 500 F.2d 267 (2d Cir. 1974). In that case, our government's duty under international law to refrain from kidnapping a criminal defendant from within the borders of another nation, where formal extradition procedures existed, infringed the personal rights of the defendant, whose international law claims were thereupon remanded for a hearing in the district court.

**10.** Eighteen nations have incorporated the Universal Declaration into their own constitutions. 48 *Revue Internationale de Droit Penal* Nos. 3 & 4, at 211 (1977).

**11.** Article 1
1. For the purpose of this Declaration, torture means any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted by or at the instigation of a public official on a person for such purposes as obtaining from him or a third person information or confession, punishing him for an act he has committed or is suspected of having committed, or intimidating him or other persons. It does not include pain or suffering arising only from, inherent or incidental to lawful sanctions to the extent consistent with the Standard Minimum Rules for the Treatment of Prisoners.
2. Torture constitutes an aggravated and deliberate form of cruel, inhuman or degrading treatment or punishment.

Article 2
Any act of torture or other cruel, inhuman or degrading treatment or punishment is an offense to human dignity and shall be condemned as a denial of the purposes of the Charter of the United Nations and as a violation of human rights and fundamental freedoms proclaimed in the Universal Declaration of Human Rights.

Article 3
No state may permit or tolerate torture or other cruel, inhuman or degrading treatment or punishment. Exceptional circumstances such as a state of war or a threat of war, internal political instability or any other public emergency may not be invoked as a justification of torture or other cruel, inhuman or degrading treatment or punishment.

Article 4
Each state shall, in accordance with the provisions of this Declaration, take effective measures to prevent torture and other cruel, inhuman or degrading treatment or punishment from being practiced within its jurisdiction.

Article 5
The training of law enforcement personnel and of other public officials who may be responsible for persons deprived of their liberty shall ensure that full account is taken of the prohibition against torture and other cruel, inhuman or degrading treatment or punishment. This prohibition shall also, where appropriate, be included in such general rules or instructions as are issued in regard to the duties and functions of anyone who may be involved in the custody or treatment of such persons.

Article 6
Each state shall keep under systematic review interrogation methods and practices as well as arrangements for the custody and treatment of persons deprived of their liberty in its territory, with a view to preventing any cases of torture or other cruel, inhuman or degrading treatment or punishment.

Article 7
Each state shall ensure that all acts of torture as defined in Article I are offenses under its criminal law. The same shall apply in regard to acts which constitute participation in, complicity in, incitement to or an attempt to commit torture.

Article 8
Any person who alleges he has been subjected to torture or other cruel, inhuman or degrading treatment or punishment by or at the instigation of a public official shall have

expressly prohibits any state from permitting the dastardly and totally inhuman act of torture. Torture, in turn, is defined as "any act by which severe pain and suffering, whether physical or mental, is intentionally inflicted by or at the instigation of a public official on a person for such purposes as . . . intimidating him or other persons." The Declaration goes on to provide that "[w]here it is proved that an act of torture or other cruel, inhuman or degrading treatment or punishment has been committed by or at the instigation of a public official, the victim shall be afforded redress and compensation, in accordance with national law." This Declaration, like the Declaration of Human Rights before it, was adopted without dissent by the General Assembly. Nayar, "Human Rights: The United Nations and United States Foreign Policy," 19 *Harv.Int'l L.J.* 813, 816 n.18 (1978).

These U.N. declarations are significant because they specify with great precision the obligations of member nations under the Charter. Since their adoption, "[m]embers can no longer contend that they do not know what human rights they promised in the Charter to promote." Sohn, "A Short History of United Nations Documents on Human Rights," in *The United Nations and Human Rights, 18th Report of the Commission* (Commission to Study the Organization of Peace ed. 1968). Moreover, a U.N. Declaration is, according to one authoritative definition, "a formal and solemn instrument, suitable for rare occasions when principles of great and lasting importance are being enunciated." 34 U.N. ESCOR, Supp. (No. 8) 15, U.N. Doc. E/cn.4/1/610 (1962) (memorandum of Office of Legal Affairs, U.N. Secretariat). Accordingly, it has been observed that the Universal Declaration of Human Rights "no longer fits into the dichotomy of 'binding treaty' against 'nonbinding pronouncement,' but is rather an authoritative statement of the international community." *E. Schwelb, Human Rights and the International Community* 70 (1964). Thus, a Declaration creates an expectation of adherence, and "insofar as the expectation is gradually justified by State practice, a declaration may by custom become recognized as laying down rules binding upon the States." 34 U.N. ESCOR, *supra*. Indeed, several commentators have concluded that the Universal Declaration has become, *in toto*, a part of binding, customary international law. Nayar, *supra*, at 816–17; Waldlock, "Human Rights in Contemporary International Law and the Significance of the European Convention," *Int'l & Comp. L.Q.*, Supp. Publ. No. 11 at 15 (1965).

Turning to the act of torture, we have little difficulty discerning its universal renunciation in the modern usage and practice of nations. *Smith, supra*, 18 U.S. (5 Wheat.) at 160–61, 5 L.Ed. 57. The international consensus surrounding torture has found expression in numerous international treaties and accords. *E. g., American Convention on Human Rights,* Art. 5, OAS

---

·the right to complain to, and to have his case impartially examined by, the competent authorities of the state concerned.

Article 9

Wherever there is reasonable ground to believe that an act of torture as defined in Article I has been committed, the competent authorities of the state concerned shall promptly proceed to an impartial investigation even if there has been no formal complaint.

Article 10

If an investigation under Article 8 or Article 9 establishes that an act of torture as defined in Article I appears to have been committed, criminal proceedings shall be instituted against the alleged offender or offenders in accordance with national law. If an allegation of other forms of cruel, inhuman or degrading treatment or punishment is considered to be well founded, the alleged offender or offenders shall be subject to criminal, disciplinary or other appropriate proceedings.

Article 11

Where it is proved that an act of torture or other cruel, inhuman or degrading treatment or punishment has been committed by or at the instigation of a public official, the victim shall be afforded redress and compensation, in accordance with national law.

Article 12

Any statement which is established to have been made as a result of torture or other cruel, inhuman or degrading treatment or punishment may not be invoked as evidence against the person concerned or against any other person in any proceeding.

Treaty Series No. 36 at 1, OAS Off. Rec. OEA/Ser 4 v/II 23, doc. 21, rev. 2 (English ed., 1975) ("No one shall be subjected to torture or to cruel, inhuman or degrading punishment or treatment"); International Covenant on Civil and Political Rights, U.N. General Assembly Res. 2200 (XXI)A, U.N. Doc. A/6316 (Dec. 16, 1966) (identical language); European Convention for the Protection of Human Rights and Fundamental Freedoms, Art. 3, Council of Europe, European Treaty Series No. 5 (1968), 213 U.N. T.S. 211 (semble). The substance of these international agreements is reflected in modern municipal—*i. e.* national—law as well. Although torture was once a routine concomitant of criminal interrogations in many nations, during the modern and hopefully more enlightened era it has been universally renounced. According to one survey, torture is prohibited, expressly or implicitly, by the constitutions of over fifty-five nations,[12] including both the United States[13] and Paraguay.[14] Our State Department reports a general recognition of this principle:

> There now exists an international consensus that recognizes basic human rights and obligations owed by all governments to their citizens . . . . There is no doubt that these rights are often violated; but virtually all governments acknowledge their validity.

Department of State, *Country Reports on Human Rights for 1979*, published as Joint Comm. Print, House Comm. on Foreign Affairs, and Senate Comm. on Foreign Rela-

tions, 96th Cong. 2d Sess. (Feb. 4, 1980), Introduction at 1. We have been directed to no assertion by any contemporary state of a right to torture its own or another nation's citizens. Indeed, United States diplomatic contacts confirm the universal abhorrence with which torture is viewed:

> In exchanges between United States embassies and all foreign states with which the United States maintains relations, it has been the Department of State's general experience that no government has asserted a right to torture its own nationals. Where reports of torture elicit some credence, a state usually responds by denial or, less frequently, by asserting that the conduct was unauthorized or constituted rough treatment short of torture.[15]

Memorandum of the United States as *Amicus Curiae* at 16 n.34.

Having examined the sources from which customary international law is derived—the usage of nations, judicial opinions and the works of jurists[16]—we conclude that official torture is now prohibited by the law of nations. The prohibition is clear and unambiguous, and admits of no distinction between treatment of aliens and citizens. Accordingly, we must conclude that the dictum in *Dreyfus v. von Finck, supra,* 534 F.2d at 31, to the effect that "violations of international law do not occur when the aggrieved parties are nationals of the acting state," is clearly out of tune with the current usage and practice of international law. The treaties and accords cited above, as well as the express foreign policy

---

12. 48 *Revue Internationale de Droit Penal* Nos. 3 & 4 at 208 (1977).

13. U.S.Const., Amend. VIII ("cruel and unusual punishments" prohibited); *id.* Amend. XIV.

14. Constitution of Paraguay, Art. 45 (prohibiting torture and other cruel treatment).

15. The fact that the prohibition of torture is often honored in the breach does not diminish its binding effect as a norm of international law. As one commentator has put it, "The best evidence for the existence of international law is that every actual State recognizes that it does exist and that it is itself under an obligation to observe it. States often violate international law; just as individuals often violate mu-

nicipal law; but no more than individuals do States defend their violations by claiming that they are above the law." J. Brierly, *The Outlook for International Law* 4–5 (Oxford 1944).

16. *See* note 4, *supra: see also Ireland v. United Kingdom,* Judgment of Jan. 18, 1978 (European Court of Human Rights), *summarized in* [1978] Yearbook, European Convention on Human Rights 602 (Council of Europe) (holding that Britain's subjection of prisoners to sleep deprivation, hooding, exposure to hissing noise, reduced diet and standing against a wall for hours was "inhuman and degrading," but not "torture" within meaning of European Convention on Human Rights).

of our own government,[17] all make it clear that international law confers fundamental rights upon all people vis-a-vis their own governments. While the ultimate scope of those rights will be a subject for continuing refinement and elaboration, we hold that the right to be free from torture is now among them. We therefore turn to the question whether the other requirements for jurisdiction are met.

### III

Appellee submits that even if the tort alleged is a violation of modern international law, federal jurisdiction may not be exercised consistent with the dictates of Article III of the Constitution. The claim is without merit. Common law courts of general jurisdiction regularly adjudicate transitory tort claims between individuals over whom they exercise personal jurisdiction, wherever the tort occurred. Moreover, as part of an articulated scheme of federal control over external affairs, Congress provided, in the first Judiciary Act, § 9(b), 1 Stat. 73, 77 (1789), for federal jurisdiction over suits by aliens where principles of international law are in issue. The constitutional basis for the Alien Tort Statute is the law of nations, which has always been part of the federal common law.

It is not extraordinary for a court to adjudicate a tort claim arising outside of its territorial jurisdiction. A state or nation has a legitimate interest in the orderly resolution of disputes among those within its borders, and where the *lex loci delicti commissi* is applied, it is an expression of comity to give effect to the laws of the state where the wrong occurred. Thus, Lord Mansfield in *Mostyn v. Fabrigas*, 1 Cowp. 161 (1774), *quoted in McKenna v. Fisk*, 42 U.S. (1 How.) 241, 248, 11 L.Ed. 117 (1843) said:

> [I]f A becomes indebted to B, or commits a tort upon his person or upon his personal property in Paris, an action in either case may be maintained against A in England, if he is there found . . . . [A]s to transitory actions, there is not a colour of doubt but that any action which is transitory may be laid in any county in England, though the matter arises beyond the seas.

*Mostyn* came into our law as the original basis for state court jurisdiction over out-of-state torts, *McKenna v. Fisk, supra*, 42 U.S. (1 How.) 241, 11 L.Ed. 117 (personal injury suits *held* transitory); *Dennick v. Railroad Co.*, 103 U.S. 11, 26 L.Ed. 439 (1880) (wrongful death action *held* transitory), and it has not lost its force in suits to recover for a wrongful death occurring upon foreign soil, *Slater v. Mexican National Railroad Co.*, 194 U.S. 120, 24 S.Ct. 581, 48 L.Ed. 900 (1904), as long as the conduct complained of was unlawful where performed. *Restatement (Second) of Foreign Relations Law of the United States* § 19 (1965). Here, where *in personam* jurisdiction has been obtained over the defendant, the parties agree that the acts alleged would violate Paraguayan law, and the policies of the forum are consistent with the foreign law,[18] state court jurisdiction would be proper. Indeed, appellees conceded as much at oral argument.

Recalling that *Mostyn* was freshly decided at the time the Constitution was ratified, we proceed to consider whether the First Congress acted constitutionally in vesting jurisdiction over "foreign suits," *Slater, supra*, 194 U.S. at 124, 24 S.Ct. at 582, alleging torts committed in violation of

17. E. g., 22 U.S.C. § 2304(a)(2) ("Except under circumstances specified in this section, no security assistance may be provided to any country the government of which engages in a consistent pattern of gross violations of internationally recognized human rights."); 22 U.S.C. § 2151(a) ("The Congress finds that fundamental political, economic, and technological changes have resulted in the interdependence of nations. The Congress declares that the

individual liberties, economic prosperity, and security of the people of the United States are best sustained and enhanced in a community of nations which respect individual civil and economic rights and freedoms").

18. Conduct of the type alleged here would be actionable under 42 U.S.C. § 1983 or, undoubtedly, the Constitution, if performed by a government official.

the law of nations. A case properly "aris[es] under the . . . laws of the United States" for Article III purposes if grounded upon statutes enacted by Congress or upon the common law of the United States. *See Illinois v. City of Milwaukee,* 406 U.S. 91, 99–100, 92 S.Ct. 1385, 1390–91, 31 L.Ed.2d 712 (1972); *Ivy Broadcasting Co., Inc. v. American Tel. & Tel. Co.,* 391 F.2d 486, 492 (2d Cir. 1968). The law of nations forms an integral part of the common law, and a review of the history surrounding the adoption of the Constitution demonstrates that it became a part of the common law *of the United States* upon the adoption of the Constitution. Therefore, the enactment of the Alien Tort Statute was authorized by Article III.

During the eighteenth century, it was taken for granted on both sides of the Atlantic that the law of nations forms a part of the common law. 1 Blackstone, Commentaries 263–64 (1st Ed. 1765–69); 4 *id.* at 67.[19] Under the Articles of Confederation, the Pennsylvania Court of Oyer and Terminer at Philadelphia, *per* McKean, Chief Justice, applied the law of nations to the criminal prosecution of the Chevalier de Longchamps for his assault upon the person of the French Consul-General to the United States, noting that "[t]his law, in its full extent, is a part of the law of this state . . . ." *Respublica v. DeLongchamps,* 1 U.S. (1 Dall.) 113, 119, 1 L.Ed. 59 (1784). Thus, a leading commentator has written:

It is an ancient and a salutary feature of the Anglo-American legal tradition that the Law of Nations is a part of the law of the land to be ascertained and administered, like any other, in the appropriate case. This doctrine was originally conceived and formulated in England in response to the demands of an expanding commerce and under the influence of theories widely accepted in the

late sixteenth, the seventeenth and the eighteenth centuries. It was brought to America in the colonial years as part of the legal heritage from England. It was well understood by men of legal learning in America in the eighteenth century when the United Colonies broke away from England to unite effectively, a little later, in the United States of America.

Dickenson, "The Law of Nations as Part of the National Law of the United States," 101 *U.Pa.L.Rev.* 26, 27 (1952).

Indeed, Dickenson goes on to demonstrate, *id.* at 34–41, that one of the principal defects of the Confederation that our Constitution was intended to remedy was the central government's inability to "cause infractions of treaties or of the law of nations, to be punished." 1 Farrand, Records of the Federal Convention 19 (Rev. ed. 1937) (Notes of James Madison). And, in Jefferson's words, the very purpose of the proposed Union was "[t]o make us one nation as to foreign concerns, and keep us distinct in domestic ones." Dickenson, *supra,* at 36 n. 28.

As ratified, the judiciary article contained no express reference to cases arising under the law of nations. Indeed, the only express reference to that body of law is contained in Article I, sec. 8, cl. 10, which grants to the Congress the power to "define and punish . . . offenses against the law of nations." Appellees seize upon this circumstance and advance the proposition that the law of nations forms a part of the laws of the United States only to the extent that Congress has acted to define it. This extravagant claim is amply refuted by the numerous decisions applying rules of international law uncodified in any act of Congress. *E. g., Ware v. Hylton,* 3 U.S. (3 Dall.) 198, 1 L.Ed. 568 (1796); *The Paquete Habana, supra,* 175 U.S. 677, 20 S.Ct. 290, 44 L.Ed. 320; *Sabbatino, supra,* 376 U.S.

---

19. As Lord Stowell said in *The Maria,* 165 Eng. Rep. 955, 958 (Adm.1807): "In the first place it is to be recollected, that this is a Court of the Law of Nations, though sitting here under the authority of the King of Great Britain. It belongs to other nations as well as to our own; and what foreigners have a right to demand from it, is the administration of the law of nations, simply, and exclusively of the introduction of principles borrowed from our own municipal jurisprudence, to which it is well known, they have at all times expressed no inconsiderable repugnance."

398, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964). A similar argument was offered to and rejected by the Supreme Court in *United States v. Smith, supra,* 18 U.S. (5 Wheat.) 153, 158–60, 5 L.Ed. 57 and we reject it today. As John Jay wrote in *The Federalist* No. 3, at 22 (1 Bourne ed. 1901), "Under the national government, treaties and articles of treaties, as well as the laws of nations, will always be expounded in one sense and executed in the same manner, whereas adjudications on the same points and questions in the thirteen states will not always accord or be consistent." Federal jurisdiction over cases involving international law is clear.

Thus, it was hardly a radical initiative for Chief Justice Marshall to state in *The Nereide,* 13 U.S. (9 Cranch) 388, 422, 3 L.Ed. 769 (1815), that in the absence of a congressional enactment,[20] United States courts are "bound by the law of nations, which is a part of the law of the land." These words were echoed in *The Paquete Habana, supra,* 175 U.S. at 700, 20 S.Ct. at 299: "[i]nternational law is part of our law, and must be ascertained and administered by the courts of justice of appropriate jurisdiction, as often as questions of right depending upon it are duly presented for their determination."

■ The Filartigas urge that 28 U.S.C. § 1350 be treated as an exercise of Congress's power to define offenses against the law of nations. While such a reading is possible, *see Lincoln Mills v. Textile Workers,* 353 U.S. 488, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957) (jurisdictional statute authorizes judicial explication of federal common law),

we believe it is sufficient here to construe the Alien Tort Statute, not as granting new rights to aliens, but simply as opening the federal courts for adjudication of the rights already recognized by international law. The statute nonetheless does inform our analysis of Article III, for we recognize that questions of jurisdiction "must be considered part of an organic growth—part of an evolutionary process," and that the history of the judiciary article gives meaning to its pithy phrases. *Romero v. International Terminal Operating Co.,* 358 U.S. 354, 360, 79 S.Ct. 468, 473, 3 L.Ed.2d 368 (1959). The Framers' overarching concern that control over international affairs be vested in the new national government to safeguard the standing of the United States among the nations of the world therefore reinforces the result we reach today. °

■ Although the Alien Tort Statute has rarely been the basis for jurisdiction during its long history,[21] in light of the foregoing discussion, there can be little doubt that this action is properly brought in federal court.[22] This is undeniably an action by an alien, for a tort only, committed in violation of the law of nations. The paucity of suits successfully maintained under the section is readily attributable to the statute's requirement of alleging a *"violation* of the law of nations" (emphasis supplied) at the jurisdictional threshold. Courts have, accordingly, engaged in a more searching preliminary review of the merits than is required, for example, under the more flexible "arising under" formula-

**20.** The plainest evidence that international law has an existence in the federal courts independent of acts of Congress is the long-standing rule of construction first enunciated by Chief Justice Marshall: "an act of congress ought never to be construed to violate the law of nations, if any other possible construction remains . . . ." *The Charming Betsy,* 6 U.S. (2 Cranch), 34, 67, 2 L.Ed. 208 (1804), *quoted in Lauritzen v. Larsen,* 345 U.S. 571, 578, 73 S.Ct. 921, 926, 97 L.Ed. 1254 (1953).

**21.** Section 1350 afforded the basis for jurisdiction over a child custody suit between aliens in *Adra v. Clift,* 195 F.Supp. 857 (D.Md.1961), with a falsified passport supplying the requisite international law violation. In *Bolchos v. Dar-*

*rell,* 3 Fed.Cas. 810 (D.S.C.1795), the Alien Tort Statute provided an alternative basis of jurisdiction over a suit to determine title to slaves on board an enemy vessel taken on the high seas.

**22.** We recognize that our reasoning might also sustain jurisdiction under the general federal question provision, 28 U.S.C. § 1331. We prefer, however, to rest our decision upon the Alien Tort Statute, in light of that provision's close coincidence with the jurisdictional facts presented in this case. *See Romero v. International Terminal Operating Co.,* 358 U.S. 354, 79 S.Ct. 468, 3 L.Ed.2d 368 (1959).

tion. *Compare O'Reilly de Camara v. Brooke*, 209 U.S. 45, 52, 28 S.Ct. 439, 441, 52 L.Ed. 676 (1907) (question of Alien Tort Statute jurisdiction disposed of "on the merits") (Holmes, J.), *with Bell v. Hood*, 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946) (general federal question jurisdiction not defeated by the possibility that the averments in the complaint may fail to state a cause of action). Thus, the narrowing construction that the Alien Tort Statute has previously received reflects the fact that earlier cases did not involve such well-established, universally recognized norms of international law that are here at issue.

 For example, the statute does not confer jurisdiction over an action by a Luxembourgeois international investment trust's suit for fraud, conversion and corporate waste. *IIT v. Vencap*, 519 F.2d 1001, 1015 (1975). In *IIT*, Judge Friendly astutely noted that the mere fact that every nation's municipal law may prohibit theft does not incorporate "the Eighth Commandment, 'Thou Shalt not steal' . . . [into] the law of nations." It is only where the nations of the world have demonstrated that the wrong is of mutual, and not merely several, concern, by means of express international accords, that a wrong generally recognized becomes an international law violation within the meaning of the statute. Other recent § 1350 cases are similarly distinguishable.[23]

IIT adopted a dictum from *Lopes v. Reederei Richard Schroder*, 225 F.Supp. 292 (E.D.Pa.1963) to the effect that "a violation of the law of nations arises only when there has been 'a violation by one or more individuals of those standards, rules or customs (a) affecting the relationship between states or between an individual and a foreign state and (b) used by those states for their common good and/or in dealings *inter se*.'" *IIT, supra*, 519 F.2d at 1015, *quoting Lopes, supra*, 225 F.Supp. at 297. We have no quarrel with this formulation so long as it be understood that the courts are not to prejudge the scope of the issues that the nations of the world may deem important to their interrelationships, and thus to their common good. As one commentator has noted:

> the sphere of domestic jurisdiction is not an irreducible sphere of rights which are somehow inherent, natural, or fundamental. It does not create an impenetrable barrier to the development of international law. Matters of domestic jurisdiction are not those which are unregulated by international law, but those which are left by international law for regulation by States. There are, therefore, no matters which are domestic by their 'nature.' All are susceptible of international legal regulation and may become the subjects of new rules of customary law of treaty obligations.

---

**23.** *Dreyfus v. von Finck*, 534 F.2d 24 (2d Cir.), *cert. denied*, 429 U.S. 835, 97 S.Ct. 102, 50 L.Ed.2d 101 (1976), concerned a forced sale of property, and thus sought to invoke international law in an area in which no consensus view existed. *See Sabbatino, supra*, 376 U.S. at 428, 84 S.Ct. at 940. Similarly, *Benjamins v. British European Airways*, 572 F.2d 913 (2d Cir. 1978), *cert. denied*, 439 U.S. 1114, 99 S.Ct. 1016, 59 L.Ed.2d 72 (1979), held only that an air disaster, even if caused by "wilful" negligence, does not constitute a law of nations violation. *Id.* at 916. In *Khedivial Line, S. A. E. v. Seafarers' International Union*, 278 F.2d 49 (2d Cir. 1960), we found that the "right" to free access to the ports of a foreign nation was at best a rule of comity, and not a binding rule of international law.

The cases from other circuits are distinguishable in like manner. The court in *Huynh Thi*

*Anh v. Levi*, 586 F.2d 625 (6th Cir. 1978), was unable to discern from the traditional sources of the law of nations "a universal or generally accepted substantive rule or principle" governing child custody, *id.* at 629, and therefore held jurisdiction to be lacking. *Cf. Nguyen Da Yen v. Kissinger*, 528 F.2d 1194, 1201 n.13 (9th Cir. 1975) ("the illegal seizure, removal and detention of an alien against his will in a foreign country would appear to be a tort . . . and it may well be a tort in violation of the 'law of nations' ") (§ 1350 question not reached due to inadequate briefing). Finally, the district court in *Lopes v. Reederei Richard Schroder*, 225 F.Supp. 292 (E.D.Pa.1963) simply found that the doctrine of seaworthiness, upon which the plaintiff relied, was a uniquely American concept, and therefore not a part of the law of nations.

Preuss, "Article 2, Paragraph 7 of the Charter of the United Nations and Matters of Domestic Jurisdiction," Hague *Receuil* (Extract, 149) at 8, *reprinted in* H. Briggs, *The Law of Nations* 24 (1952). Here, the nations have made it their business, both through international accords and unilateral action,[24] to be concerned with domestic human rights violations of this magnitude. The case before us therefore falls within the *Lopes/IIT* rule.

Since federal jurisdiction may properly be exercised over the Filartigas' claim, the action must be remanded for further proceedings. Appellee Pena, however, advances several additional points that lie beyond the scope of our holding on jurisdiction. Both to emphasize the boundaries of our holding, and to clarify some of the issues reserved for the district court on remand, we will address these contentions briefly.

## IV

■ Pena argues that the customary law of nations, as reflected in treaties and declarations that are not self-executing, should not be applied as rules of decision in this case. In doing so, he confuses the question of federal jurisdiction under the Alien Tort Statute, which requires consideration of the law of nations, with the issue of the choice of law to be applied, which will be addressed at a later stage in the proceedings. The two issues are distinct.

Our holding on subject matter jurisdiction decides only whether Congress intended to confer judicial power, and whether it is authorized to do so by Article III. The choice of law inquiry is a much broader one, primarily concerned with fairness, *see Home Insurance Co. v. Dick,* 281 U.S. 397, 50 S.Ct. 338, 74 L.Ed. 926 (1930); consequently, it looks to wholly different considerations. *See Lauritzen v. Larsen,* 345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254 (1954). Should the district court decide that the *Lauritzen* analysis requires it to apply Paraguayan law, our courts will not have occasion to consider what law would govern a suit under the Alien Tort Statute where the challenged conduct is actionable under the law of the forum and the law of nations, but not the law of the jurisdiction in which the tort occurred.[25]

■ Pena also argues that "[i]f the conduct complained of is alleged to be the act of the Paraguayan government, the suit is barred by the Act of State doctrine." This argument was not advanced below, and is therefore not before us on this appeal. We note in passing, however, that we doubt whether action by a state official in violation of the Constitution and laws of the Republic of Paraguay, and wholly unratified by that nation's government, could properly be characterized as an act of state. *See Banco Nacionale de Cuba v. Sabbatino, supra,* 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d

24. As President Carter stated in his address to the United Nations on March 17, 1977:

All the signatories of the United Nations Charter have pledged themselves to observe and to respect basic human rights. Thus, no member of the United Nations can claim that mistreatment of the citizens is solely its own business. Equally, no member can avoid its responsibilities to review and to speak when torture or unwarranted deprivation occurs in any part of the world.

Reprinted in 78 Department of State Bull. 322 (1977); see note 17, *supra.*

25. In taking that broad range of factors into account, the district court may well decide that fairness requires it to apply Paraguayan law to the instant case. *See Slater v. Mexican National Railway Co.,* 194 U.S. 120, 24 S.Ct. 581, 48 L.Ed. 900 (1904). Such a decision would not retroactively oust the federal court of subject matter jurisdiction, even though plaintiff's

cause of action would no longer properly be "created" by a law of the United States. *See American Well Works Co. v. Layne & Bowler Co.,* 241 U.S. 257, 260, 36 S.Ct. 585, 586, 60 L.Ed. 987 (1916) (Holmes, J.). Once federal jurisdiction is established by a colorable claim under federal law at a preliminary stage of the proceeding, subsequent dismissal of that claim (here, the claim under the general international proscription of torture) does not deprive the court of jurisdiction previously established. *See Hagans v. Lavine,* 415 U.S. 528, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974); *Romero v. International Terminal Operating Co.,* 358 U.S. 354, 79 S.Ct. 468, 3 L.Ed.2d 368 (1959); *Bell v. Hood,* 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946). *Cf. Huynh Thi Ahn, supra,* 586 F.2d at 633 (choice of municipal law ousts § 1350 jurisdiction when no international norms exist).

**890**

804; *Underhill v. Hernandez*, 168 U.S. 250, 18 S.Ct. 83, 42 L.Ed. 456 (1897). Paraguay's renunciation of torture as a legitimate instrument of state policy, however, does not strip the tort of its character as an international law violation, if it in fact occurred under color of government authority. *See* Declaration on the Protection of All Persons from Being Subjected to Torture, *supra* note 11; *cf. Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908) (state official subject to suit for constitutional violations despite immunity of state).

Finally, we have already stated that we do not reach the critical question of *forum non conveniens*, since it was not considered below. In closing, however, we note that the foreign relations implications of this and other issues the district court will be required to adjudicate on remand underscores the wisdom of the First Congress in vesting jurisdiction over such claims in the federal district courts through the Alien Tort Statute. Questions of this nature are fraught with implications for the nation as a whole, and therefore should not be left to the potentially varying adjudications of the courts of the fifty states.

In the twentieth century the international community has come to recognize the common danger posed by the flagrant disregard of basic human rights and particularly the right to be free of torture. Spurred first by the Great War, and then the Second, civilized nations have banded together to prescribe acceptable norms of international behavior. From the ashes of the Second World War arose the United Nations Organization, amid hopes that an era of peace and cooperation had at last begun. Though many of these aspirations have remained elusive goals, that circumstance cannot diminish the true progress that has been made. In the modern age, humanitarian and practical considerations have combined to lead the nations of the world to recognize that respect for fundamental human rights is in their individual and collective interest. Among the rights universally proclaimed by all nations, as we have noted, is the right to be free of physical torture. Indeed, for purposes of civil liability, the torturer has become—like the pirate and slave trader before him—*hostis humani generis*, an enemy of all mankind. Our holding today, giving effect to a jurisdictional provision enacted by our First Congress, is a small but important step in the fulfillment of the ageless dream to free all people from brutal violence.