GREGORY, Circuit Judge,
concurring in part and dissenting in part:
I write separately to dissent from Part III of the majority opinion, as I would hold that the Supreme Court’s decision in Kiobel v. Royal Dutch Petroleum Co., — U.S. -, 133 S.Ct. 1659, 185 L.Ed.2d 671 (2013), does not foreclose the possibility of relief under the Alien Tort Statute (“ATS”) here.
I.
In Kiobel, a group of Nigerian political asylees brought suit against Royal Dutch Petroleum Company, Shell Transport and Trading Company, and their joint subsidiary, Shell Petroleum Development Company of Nigeria, alleging that these companies aided and abetted the Nigerian government in committing human rights abuses against them. 133 S.Ct. at 1662-63. The defendants’ only contacts with the United States were “listings on the New York Stock Exchange and an affiliation with a public relations office in New York.” Mujica v. AirScan Inc., 771 F.3d 580, 591 (9th Cir.2014) (citing Kiobel, 133 S.Ct. at 1662-63; id. at 1677-78 (Breyer, J., concurring)). The Court explained that “[e]orporations are often present in many countries, and it would reach too far to say that mere corporate presence suffices” to displace the presumption against extraterritoriality. Kiobel, 133 S.Ct. at 1669. The Court, however, was “careful to leave open a number of significant questions regarding the reach and interpretation of the Alien Tort Statute.” Id. (Kennedy, J., concurring).
Following Kiobel, a number of our sister circuits have considered and rejected ATS claims brought against U.S. corporations and their corporate officers for aiding and abetting foreign actors who commit human rights abuses. See Maj. Op. 659-60 (citing Doe v. Drummond Co., 782 F.3d 576, 601 (11th Cir.2015); Chowdhury v. Worldtel Bangladesh Holding, Ltd., 746 F.3d 42, 45 (2d Cir.2014); Cardona v. Chiquita Brands Int’l Inc., 760 F.3d 1185, 1188-89 (11th Cir.2014); Mujica, 771 F.3d at 596; Balintulo v. Daimler AG, 727 F.3d 174, 179 (2d Cir.2013)). But no circuit court has decided a post-Kiobel ATS case premised on principal liability brought against an individual defendant who has sought safe haven in the United States, a key difference the majority does not address. This is not to suggest that Kiobel applies only to corporate defendants, see Maj. Op. 660 n. 8, but that the analysis and relevant considerations may differ where the defendant is a natural person.
Several cases brought prior to Kiobel considered situations involving individual, natural-person defendants-facts more akin to those presented here. In Filartiga v. Penar-Imla, 630 F.2d 876, 878 (2d Cir. 1980), two Paraguayan citizens brought an action against Pena-Irala (“Pena”), a Paraguayan police officer, for the torture and death of a relative. Pena had come to the United States, overstayed his visitor’s visa, and had been residing in the United States for over nine months when one of the plaintiffs served him with a summons and civil complaint. Id. at 878-79. While acknowledging that “the Alien Tort Statute ha[d] rarely been the basis for jurisdiction during its long history,” the Second Circuit found “little doubt” that the action was properly in federal court. Id. at 887. “This is undeniably an action by an alien, for a tort only, committed in violation of the law of nations.” Id. Thus, jurisdiction under *663 the ATS was proper. Id. at 889; see also Kadic v. Karadzic, 70 F.3d 232, 236-37 (2d Cir.1995) (finding jurisdiction for ATS claims brought by Croat and Muslim citizens of Bosnia-Herzegovina against Bosnian-Serb leader for violations of the law of nations committed during the Bosnian civil war); In re Estate of Ferdinand E. Marcos Human Rights Litig., 978 F.2d 493, 503 (9th Cir.1992) (finding jurisdiction for ATS claim brought by Philippine citizen against former Philippine official for violations of the law of nations committed abroad).
The majority states that “recent Supreme Court decisions have significantly limited, if not rejected, the applicability of the Filartiga rationale.” Maj. Op. 658 (citing Kiobel, 133 S.Ct. at 1664; Sosa v. Alvarez-Machain, 542 U.S. 692, 732, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004)). Nothing in those opinions, however, explicitly overrules Filartiga or its progeny. In fact, the Supreme Court in Sosa “referred to [Filartiga and Marcos ] with approval, suggesting that the ATS allowed a claim for relief in such circumstances.” Kiobel, 133 S.Ct. at 1675 (Breyer, J., concurring) (citing Sosa, 542 U.S. at 732, 124 S.Ct. 2739). Even Congress has recognized that Filartiga was “met with general approval.” H.R.Rep. No. 102-367, pt. 1, at 4 (1991); S.Rep. No. 102-249, at 4 (1991). Therefore, Filartiga is still good law, and its reasoning is instructive here.
II.
This case involves “allegations of serious violations of international law” committed by a natural person who has sought safe haven within our borders and includes claims that are not covered by the Torture Victim Protection Act nor “the reasoning and holding” of Kiobel. Id. at 1669 (Kennedy, J., concurring). Thus, the “proper implementation of the presumption against extraterritorial application” in this case requires “further elaboration and explanation.” Id. Blithely relying on the fact that the human rights abuses occurred abroad ignores the myriad ways in which this claim touches and concerns the territory of the United States.
As the majority correctly states, “claims” are cognizable under the ATS where they “touch and concern the territory of the United States ... with sufficient force to displace the presumption against extraterritorial application.” Maj. Op. 659 (citing Kiobel, 133 S.Ct. at 1669). The Supreme Court’s use of “claim” — rather than conduct — to describe the circumstances in which the presumption may be displaced, however, “suggest[s] that courts must consider all the facts that give rise to ATS claims, including the parties’ identities and their relationship to the causes of action.” Al Shimari v. CACI Premier Tech., Inc., 758 F.3d 516, 527 (4th Cir. 2014).
If we consider, as we must, a “broader range of facts than the location where the plaintiff [] actually sustained [his] injuries,” there are three facts that distinguish this case from Kiobel. Id. at 529. First, Ali’s status as a lawful permanent resident alone distinguishes this case from Kiobel, where the corporate defendant was merely “present.” Kiobel, 133 S.Ct. at 1669. This Court found a defendant’s citizenship status to be a relevant “touch” in Al Shimari, where we observed that such “case[s] do [ ] not present any potential problems associated with bringing foreign nationals into United States courts to answer for conduct committed abroad, given that the defendants are United States citizens.” Al Shimari, 758 F.3d at 530 (citing Sexual Minorities Uganda v. Lively, 960 F.Supp.2d 304, 322 (D.Mass.2013) (holding that Kio-bel did not bar ATS claims against an American citizen, in part because “[t]his is *664 not a.case where a foreign national is being hailed into an unfamiliar court to defend himself’)). To the extent that we rely on citizenship status as a factor, we do so in the good company of our dear colleagues sitting on this very Court. See Maj. Op. 660, n. 8. As a legal permanent resident, Ali “has a binding tie to the United States and its court system.” Yousuf v. Somantar, 699 F.3d 763, 778 (4th Cir.2012); see also id. at 767 (finding relevant the fact that U.S. residents “who enjoy the protections of U.S. law ordinarily should be subject to the jurisdiction of the courts”).
Second, Ali’s “after-acquired residence” in this country is not mere “happenstance.” Maj. Op. 660. Ali was in the United States when he “realiz[ed] that the Barre regime was about to fall.” Decl. of Ali ¶ 15, Br. in Supp. of Def.’s Renewed Mot. to Dismiss at 1, Warfaa v. Ali, 33 F.Supp.3d 653 (2014) (No. 1:05-cv-701), ECF No. 91. He initially sought refugee status in Canada. Id. at ¶ 15. Canada deported Ali back to the United States for gross human rights abuses committed in Somalia. Id. at ¶ 18; J.A. 74. When confronted with deportation proceedings upon entering the United States, he voluntarily departed, only to return two years later on a spousal visa. Decl. of Ali ¶ 22. In 1997, Ali was confronted with deportation proceedings yet again but prevailed at trial to have proceedings terminated. Id. at ¶ 23. The government did not appeal. Id. He has been living here as a lawful permanent resident, availing himself of the benefits and privileges of U.S. residency since 1996.
Lastly, when the alleged acts of torture took place, Ali was serving as a commander in the Somali National Army. In that same capacity, he received extensive military training, on numerous occasions, in the United States. The details of these contacts, which took place prior to and following the alleged acts, are laid out by Ali himself in a declaration to the district court.[1] In 1984, Ali received special military training with the Officers’ Advanced Military Course at Fort Benning, Georgia. Decl. of Ali ¶ 8, Br. in Supp. of Def.’s Renewed Mot. to Dismiss at 1, Warfaa v. Ali, 33 F.Supp.3d 653 (2014) (No. 1:05-cv-701), ECF No. 91. Later that year, he returned to Fort Benning where he completed six months of intensive military training. Id. at ¶ 10. In 1985, he was invited by a representative of the Defense Intelligence Agency to pursue further military training at Fort Leavenworth, where he spent a year, before returning to Somalia in July of 1986. Id. Finally, he received training in management studies with the U.S. Air Force at Keesler Air Force Base a mere two years after the acts alleged against him in this case. Id. at ¶ 10. This is not to suggest that the U.S. government condoned or endorsed defendant’s conduct, but these contacts are clearly relevant to a test that requires us to consider whether a claim “touch[es] and concern[s] the territory of the United States.”[2] Kiobel, 133 S.Ct. at 1669. When pressed at oral argu *665 ment, even counsel for Ali did not deny that a “prior relationship,” such as the military training at issue here, would “perhaps” be something to consider as part of the touch and concern inquiry. Oral Argument at 34:44.
Whatever the extent of the relationship between Ali and the U.S. military, it cannot be fairly said that “[t]he only purported ‘touch’ in this case is the happenstance of Ali’s after-acquired residence in the United States long after the alleged events of abuse.” Maj. Op. 660-61.
III.
The majority today allows a U.S. resident to avoid the process of civil justice for allegedly “eommit[ting] acts abroad that would clearly be crimes if committed at home.” United States v. Bollinger, 798 F.3d 201, 219 (4th Cir.2015) (upholding the constitutionality of 18 U.S.C. § 2423(c) under the Foreign Commerce Clause). The precedential effect of this holding “could undoubtedly have broad ramifications on our standing in the world, potentially disrupting diplomatic and even commercial relationships.” Id.
It is not the extraterritorial application of the ATS in the instant case that “risks interference in United States foreign policy,” but rather, providing safe haven to an individual who allegedly committed numerous atrocities abroad. Maj. Op. 659. This was the case in Filartiga, where, as here, “[t]he individual torturer was found residing in the United States.” Suppl. Br. for United States as Amicus Curiae in Partial Supp. of Affirmance at 4, Kiobel v. Royal Dutch Petroleum Co., 133 S.Ct. 1659 (2013) (No. 10-1491). These are “circumstances that could give rise to the prospect that this country would be perceived as harboring the perpetrator,” thereby “seriously damaging] the credibility of our nation’s commitment to the protection of human rights.” Id. at 19 (citing Mem. for the United States as Amicus Curiae at 22-23, Filartiga v. Pena-lrala, 630 F.2d 876 (2d.1979) (No. 79-6090)). Such concerns are precisely what led the United States, writing as amicus in Kiobel, to conclude that “allowing suits based on conduct occurring in a foreign country in the circumstances presented in Filartiga is consistent with the foreign relations interests of the United States, including the promotion of respect for human rights.” Suppl. Br. for the United States in Partial Supp. of Affirmance at 4-5, Kiobel, 133 S.Ct. 1659 (2013) (No. 10-1491).
The ATS has not been completely abrogated by Kiobel. It is still a statute, and Congress meant something by it. The fact that the alleged torts occurred outside our borders cannot be the end of the story; what we are dealing with, after all, is the Alien Tort Statute.
Ali is alleged to have committed gross human rights abuses, for which he was deported from Canada, and is now a lawful permanent resident. The United States is the sole forum in which he is amenable to suit. The atrocious nature of these allegations, the extensive contacts with the United States, and the context of those contacts renders jurisdiction proper under the ATS. I would reverse the district court’s summary dismissal of the ATS claims and find that Warfaa has pleaded sufficient facts showing that his claim touches and concerns the territory of the United States. I respectfully dissent from the majority’s holding on this issue.

. All's military training in the United States is a relevant "touch” and the fact that it was brought to the Court’s attention solely by Ali himself does not insulate it from our consideration. Cf. United States v. Wilson, 699 F.3d 789, 793 (4th Cir.2012) ("[W]hen a requirement goes to subject-matter jurisdiction, courts are obligated to consider sua sponte issues that the parties have disclaimed or have not presented.”) (quoting Gonzalez v. Thaler, - U.S. -, 132 S.Ct. 641, 648, 181 L.Ed.2d 619 (2012)).

. See George James, Somalia’s Overthrown Dictator, Mohammed Siad Barre, Is Dead, N.Y. Times, Jan. 3, 1995, at C41 (“Somalia received military and economic aid from the United States for a promise of American use of the port of Berbera on the Gulf of Aden. But aid declined drastically as allegations of human rights abuses rose.”).