UNITED STATES of America, Plaintiff,

v.

Nikolaus SCHIFFER, Defendant.

Civ. A. No. 91–5644.

United States District Court,
E.D. Pennsylvania.

Oct. 28, 1993.

Robin Kofsky Gold, Robert G. Seasonwein, Washington, DC, and Catherine L. Votaw, Philadelphia, PA, Asst. U.S. Attys., for U.S.

William E. Jones, Abington, PA, for defendant.

### OPINION AND ORDER

VAN ANTWERPEN, District Judge.

This is a non-jury civil action under section 340(a) of the Immigration and Nationality Act of 1952 to revoke the citizenship of defendant Nikolaus Schiffer, who was a member of the *Waffen*-SS Death's Head Battalion during World War II. We have jurisdic-

tion under 8 U.S.C. § 1451 and 28 U.S.C. § 1345. This court previously decided certain pre-trial motions in an Opinion and Order dated February 25, 1992. *United States v. Schiffer*, 798 F.Supp. 1128 (E.D.Pa.1992).

In a trial beginning on March 16, 1993, this court heard seven days of testimony regarding plaintiff's claims and the defendant's defenses. After a careful review of the extensive record in this case, including the trial transcript, the exhibits and the parties' post-trial memoranda and briefs, this court issued an eighty-two page opinion which granted judgment for the plaintiff. In our August 25, 1993 Decision and Order, *United States v. Schiffer*, 831 F.Supp. 1166 (E.D.Pa.1993) ("Decision"), this court made one hundred sixty-one findings of fact with citations to the relevant portions of the record, and the following conclusions of law:

A. *Expatriation*

1. Nikolaus Schiffer was born in the United States and, as a result, acquired United States citizenship.

2. Nikolaus Schiffer knew at least from the time that he was a teenager that he was a United States citizen. He also knew that as a United States citizen he was exempt from Romanian service.

3. Nikolaus Schiffer voluntarily joined the Romanian army and he did so with the specific intent to relinquish the United States citizenship he acquired at birth.

4. Nikolaus Schiffer voluntarily relinquished his United States citizenship pursuant to 8 U.S.C. § 1481(a)(3). (Note: We believe that Schiffer's voluntary service in the *Waffen*–SS alone also would have been sufficient to relinquish the United States citizenship he acquired at birth).

B. *Denaturalization*

1. Nikolaus Schiffer procured his naturalized United States citizenship illegally. 8 U.S.C. § 1451(a).

(a) Nikolaus Schiffer lacked the good moral character required for citizenship as a result of his voluntary service in the *Waffen*–SS Death's Head Battalion, participation in two death marches and armed guarding of prisoners forced to perform slave labor under dangerous and subhuman conditions. 8 U.S.C. § 1427(a)(3).

(b) Nikolaus Schiffer lacked the good moral character required for citizenship as a result of the false testimony he gave in response to Question Nos. 10 and 23 on Form N–400 with the subjective intent of obtaining immigration benefits. 8 U.S.C. § 1451(a).

2. Nikolaus Schiffer procured his naturalized citizenship by willful concealment and misrepresentation of a material fact. 8 U.S.C. § 1451(a).

(a) Nikolaus Schiffer willfully misrepresented and concealed his arrest as a war crimes suspect.

(b) Disclosure of Schiffer's arrest as a war crimes suspect would have resulted in denial of citizenship since it would have revealed his *Waffen*–SS Death's Head Battalion service, his false testimony and his lack of good moral character.

3. Nikolaus Schiffer's citizenship must be revoked. 8 U.S.C. § 1451(a).

Decision, at 80–81. The Decision treated the relevant legal issues with a thorough review of the applicable law and pertinent facts. On August 25, 1993, we ordered that this court's order of August 13, 1958, admitting defendant to citizenship, be set aside and defendant's Certificate of Naturalization be canceled and surrendered.

Defendant now moves pursuant to Federal Rule of Civil Procedure 59(a) for a New Trial and/or Amendment of Judgment, and pursuant to Rule 52(b) for Amended Findings of Fact and Conclusions of Law.[1] We discuss

---

1. Defendant filed this motion on September 4, 1993. It has come to this court's attention that defendant filed a notice of appeal to the Third Circuit Court of Appeals on September 24, 1993. Defendant presumably ignored Rule 4(a)(4) of the Federal Rules of Appellate Procedure. According to Rule 4(a)(4), if a timely motion is filed in the district court under Rule 52(b) to amend or make additional findings of fact, or under Rule 59 to alter or amend the judgment, or under Rule 59 for a new trial, a notice of appeal "filed before the disposition of any of the above motions shall have no effect." Since defendant's notice of appeal was filed prior to this opinion

defendant's failure to comply with Local Civil Rule 20(E) in Section I, defendant's failure to meet legal standards under Rule 59(a)(2) in Section II, defendant's Motion to Amend Findings of Fact and Conclusions of Law in Section III, and we conclude in Section IV.

## I. FAILURE TO COMPLY WITH LOCAL RULE 20(E)

■ Defendant filed his Motions for a New Trial and/or Amendment of Judgment and for Amended Findings of Fact and Conclusions of Law on September 4, 1993. Local Civil Rule 20 of the U.S. District Court for the Eastern District of Pennsylvania governs the court's requirements for motion practice. Subsection (e) covers the procedures required for post-trial motions. Local Rule 20(e) provides that:

> Within ten (10) days after filing any post-trial motion, the movant shall either (a) order a transcript of the trial by a writing delivered to the Court Reporter Coordinator, or (b) file a verified motion showing good cause to be excused from this requirement.

The rule further provides that unless the movant orders a transcript in the manner stated, or is excused from obtaining a transcript, the movant's post-trial motion may be dismissed for lack of prosecution.

Defendant did not comply with either requirement of Local Rule 20(e). The Court Reporter Coordinator has confirmed that, as of October 20, 1993, defendant had still neglected to order a transcript of the trial as required under subsection (a).[2] Alternatively, within ten (10) days of filing his motions, defendant could have petitioned this court to be excused from ordering the transcript, for good cause, under subsection (b). Defendant simply ignored this court's procedures. While defendant may have had good cause in

this case, the question of good cause is one that the court must answer upon verified motion of the movant.

Our courts frequently dismiss post-trial motions based solely on noncompliance with Local Rule 20(e).[3] These cases acknowledge that the sanction of dismissal for lack of prosecution is indeed a harsh penalty for noncompliance, especially where it might have been an innocent oversight. However, the Third Circuit Court of Appeals has repeatedly singled out Local Rule 20(e) for special consideration. *See generally, Hewlett v. Davis,* 844 F.2d 109 (3rd Cir.1988) (motion dismissed for lack of prosecution under Local Rule 20(e)); *Smith v. Oelenschlager,* 845 F.2d 1182 (3rd Cir.1988) (dismissal proper under Local Rule 20(e) where movant made timely transcript request to the court and not to Court Reporter Coordinator); *Frangos v. Doering Equipment Corp.,* 860 F.2d 70 (3rd Cir.1988) (motion dismissed for lack of compliance with Local Rule 20(e)).

■ During customary motion practice, dismissal of a case as a sanction must be a sanction of "last, not first, resort." *Poulis v. State Farm Fire and Cas. Co.,* 747 F.2d 863 at 869 (3rd Cir.1984). However, ordinary motions during the course of a civil lawsuit must be distinguished from post-trial motions. In *Smith v. Oelenschlager,* 845 F.2d 1182 at 1184 (3rd Cir.1988), the Third Circuit Court of Appeals noted that the judges of the Eastern District deliberately framed Local Rule 20(e) in mandatory terms. The rule reflects the notion that the interests of justice are best served by permitting only those post-trial motions which conform to certain strict requirements. Short, inflexible deadlines are essential in post-trial motion practice; otherwise, the same litigation could go on and on for years even after the court has entered judgment. The "harsh" approach of Local Rule 20(e) preserves the integrity of

---

being issued, defendant's notice of appeal was invalid. In a letter dated October 15, 1993, defendant's attorney agreed to the dismissal of the Notice of Appeal as premature.

**2.** Local Rule 20(c) states that the movant shall order the transcript within ten (10) days of filing the post-trial motion. In this case, the court discovered that defendant had *never* ordered any transcripts of the trial.

**3.** *See, e.g., Bloom v. Consolidated Rail Corp.,* 1993 WL 377068 (E.D.Pa., Sept. 15, 1993); *Gay v. Kramer,* 1993 WL 338172 (E.D.Pa., August 31, 1993); *Amissah v. William Penn Life Ins. Co.,* 1993 WL 102509 (E.D.Pa., May 28, 1993); *Bongard v. Korn,* 1993 WL 39267 (E.D.Pa., April 16, 1993); *Wodarczyk v. Beloit Corp.,* 1992 WL 220981 (E.D.Pa., Sept. 3, 1992).

civil judgments and is consistent with the overall post-trial scheme of the Federal Rules of Civil Procedure.

In *Hewlett v. Davis*, the Third Circuit stated that the power to dismiss for lack of prosecution under Local Rule 20(e) may be exercised without notice or opportunity to be heard, and rests solely within the discretion of the trial court. *Hewlett, supra,* at 114 (citing *Link v. Wabash Railroad Co.*, 370 U.S. 626, 629–30, 82 S.Ct. 1386, 1388, 8 L.Ed.2d 734 (1962)). Thus, it is properly within the discretion of this court to dismiss all of defendant's post-trial motions for lack of compliance with Local Rule 20(e). The court understands, however, the magnitude of its August 25, 1993 Decision and, although we will dismiss this motion for lack of compliance with our Local Civil Rule, we will also address the substantive claims which form the basis of defendant's motions.

## II. FAILURE TO MEET LEGAL STANDARDS UNDER RULE 59(a)(2)

### A. STANDARD OF REVIEW FOR A NEW TRIAL

■ Errors in judicial rulings or in the conduct of the court warrant a new trial where the error or conduct was prejudicial. 6A J. Moore, Moore's Federal Practice § 59.-08(2) (2d ed. 1983). Rule 59 of the Federal Rules of Civil Procedure provides:

> (a) *Grounds.* A new trial may be granted to all or any of the parties and on all or part of the issues ... (2) in an action tried without a jury, for any of the reasons for which rehearings have heretofore been granted in suits in equity in the courts of the United States. On a motion for a new trial in an action tried without a jury, the court may open the judgment if one has been entered, take additional testimony, amend findings of fact and conclusions, and direct the entry of a new judgment.

Fed.R.Civ.P. 59(a). The decision to grant a new trial lies within the court's discretion. *Allied Chemical Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36, 101 S.Ct. 188, 190, 66 L.Ed.2d 193 (1980); *American Bearing Co. v. Litton Industries, Inc.*, 729 F.2d 943, 948 (3d Cir.), *cert. denied,* 469 U.S. 854, 105 S.Ct. 178, 83

L.Ed.2d 112 (1984). Courts have cited three grounds for granting a new trial under Rule 59(a)(2): (1) manifest error of law; (2) manifest error of fact; and (3) newly discovered evidence. *See, Brown v. Wright*, 588 F.2d 708 (9th Cir.1978).

■ A new trial cannot be granted, however, because of mere harmless error: "no error or defect in any ruling or order ... is ground for granting a new trial ... unless refusal to take such action appears to the court inconsistent with substantial justice." Fed.R.Civ.P. 61. Moreover, Rule 59 is not intended to allow one party to better its position through the initiative of filing a post-trial motion, rather it is an opportunity for the court to correct any injustice which may have occurred during trial. *See Medtronic, Inc. v. Intermedics, Inc.*, 799 F.2d 734 (Fed. Cir.1986).

### B. DISCUSSION OF FACTUAL AND LEGAL CLAIMS

■ We fail to find any merit in defendant's motion for new trial and/or proposed amended findings of fact. In his Motion for New Trial, defendant primarily presents claims which already have been reviewed and rejected by this court. Because the court evaluated the same claims in reaching its judgment after trial, we will not rehash them here.

To the extent that defendant alleges error based upon theories not pursued at trial, we find no manifest error of law or fact. Moreover, defendant was put on notice at the conclusion of trial by this court's Order of March 31, 1993 that *"the parties shall be limited to the arguments, issues, cases and facts raised in said proposed findings of fact and briefs,* and [therefore] the Court may treat any issue not raised and any exhibit, stipulation, testimony, or deposition not referred to in these submissions of counsel as waived for the purposes of this non-jury trial."* (emphasis in original). Since the evidence and issues that defendant seeks to introduce are evidence and issues that defendant could have presented at trial, it is appropriate for this court to preclude defendant from raising them at this point in the litigation. As the United States Court of Appeals

for the Ninth Circuit stated in *Brown v. Wright*, *supra*, "the defendant's desire to introduce additional evidence after losing the case did not constitute a proper ground for granting a new trial." 588 F.2d at 710. Our courts have held that a new trial will not be granted on grounds that could have been but were not raised during trial. *Green v. Philadelphia Gas Works*, 333 F.Supp. 1398 (E.D.Pa.1971), *aff'd Green v. Parisi*, 478 F.2d 313 (3d Cir.1973). We find the defendant precluded from making these claims because he failed to raise these issues at trial, or in his post-trial memoranda or proposed conclusions of law. Nonetheless, in the interests of justice, we consider the validity of his particular claims below, and find them meritless.

## 1. DEFENDANT'S CLAIMS UNDER THE UNITED NATIONS UNIVERSAL DECLARATION OF HUMAN RIGHTS

■ Defendant has asserted the United Nations Universal Declaration of Human Rights ("United Nations Declaration"), Articles II, VII, IX, XI, XII, and XV, (Proclaimed by General Assembly Resolution 217 (III) of Dec. 10, 1948), U.N.Gen.Ass.Off.Rec., 3d Sess., Resolutions (A/810) at 71, as a basis for his claim to a new trial. Defendant, however, has not presented specific arguments to support his charge that the findings of fact and judgment entered at trial in this case violate the United Nations Declaration. *See Defendant's Motion for New Trial and/or Amended Findings of Fact/Conclusions of Law and/or Amendment of Judgment*, 1–2. Moreover, as noted the defendant did not allege violation of the United Nations Declaration at trial despite having the opportunity to do so.

■ This court has little trouble with the proposition that entitlements, duties, and immunities created or recognized under international law are cognizable by the courts of the United States in an appropriate case. Concern for the recognition of the law of nations found frequent expression through the Framers of the Constitution. *See* M. Glennon, *Constitutional Diplomacy*, (1990). From the beginning, the federal courts have acknowledged their competence to hear and determine cases involving the law of nations. In *The Nereide*, 13 U.S. (9 Cranch) 388, 422, 3 L.Ed. 769 (1815), Chief Justice John Marshall observed that at least in the absence of a governing Act of Congress,[4] the federal courts are "bound by the law of nations, which is a part of the law of the land." In *The Paquete Habana*, 175 U.S. 677, 700, 20 S.Ct. 290, 299, 44 L.Ed. 320 (1900), the United States Supreme Court reiterated Marshall's views:

> International law is part of our law, and must be ascertained by the courts of justice of appropriate jurisdiction, as often as questions of right depending upon it are duly presented for their determination.

*See also Kansas v. Colorado*, 206 U.S. 46, 97, 27 S.Ct. 655, 667, 51 L.Ed. 956 (1907). Recent decisions by the federal courts are in total harmony with this view. *See e.g., Filartiga v. Pena–Irala*, 630 F.2d 876, 885–87 (2d Cir.1980) ("[T]he law of nations ... has always been a part of the federal common law."); *United States v. Postal*, 589 F.2d 862, 873–84 (5th Cir.1979); *In re Alien Children Ed. Litigation*, 501 F.Supp. 544, 589–96 (S.D.Tex.1980), *prob. juris. noted sub. nom. Texas v. Certain Named and Unnamed Alien Children*, 452 U.S. 937, 101 S.Ct. 3078, 69 L.Ed.2d 950 (1981). In this case, however, the defendant fails to bring a valid claim under international law principles.

The defendant asserts rights under the United Nations Universal Declaration of Human Rights, *supra*.[5] It simplifies matters to observe initially that the defendant's claims in no way arise "under the ... treaties of the

---

**4.** It has been a well-settled rule of statutory construction that "an act of Congress ought never to be construed to violate the law of nations, if any other possible construction remains...." *The Charming Betsy*, 6 U.S. (2 Cranch) 64, 67, 2 L.Ed. 208 (1804); *Lauritzen v. Larsen*, 345 U.S. 571, 578, 73 S.Ct. 921, 926, 97 L.Ed. 1254 (1953); *Restatement of the Foreign Relations Law*

*of the United States*, § 3(c)(3) and comment j (1965).

**5.** The United Nations Declaration is just one of a number of Covenants, which informally have been termed the International Bill of Rights. *See* L. Henkin, ed., *The International Bill of Rights: The Covenant on Civil and Political Rights* (1981).

United States." 28 U.S.C. § 1331 (1981); U.S. Const., Art. II, Sec. 2. The United Nations Declaration has never received ratification by the United States Senate as a treaty, and does not have the force of treaty law within the United States. The Declaration on Human Rights is on its face a United Nations General Assembly Resolution.[6] *See* 5 M. Whiteman, *Digest of International Law* 243 (1965).

Moreover, the defendant fails to explain how the final judgment in this case contravenes either the letter or the spirit of the principles expressed in Articles II, VII, IX, XI, and XII of the United Nations Declaration. Articles II and VII deal in large part with the broad principles of equal rights and self-determination of peoples, and Articles IX, XI, and XII with generally accepted notions of due process of law—concepts far too broad to be applied directly to the issues raised in this case without specific references indicated by the defendant. *See, e.g.,* I. Brownlie, *Principles of Public International Law,* 575–78 (2d Ed.1973). Only Article XV of the United Nations Declaration—expressing right of nationality—can be read as directly relevant to the facts of this case, but its relevance must be evaluated only under norms established in customary international law.

■ Unless or until ratified as a treaty, the U.N. Declaration on Human Rights at best serves as evidence of "international common law," or customary international law. *See Filartiga v. Pena–Irala,* 630 F.2d 876 (2d Cir.1980); *In re Alien Children Ed. Litigation,* 501 F.Supp. 544, 595–96 (S.D.Tex.1980); Brownlie, *supra,* at 4–15.

In essence, the defendant is asking this court to elevate his international law claims in this matter to the level of violations of universally accepted international law principles. The defendant argues here that we should place the expatriation order of a former concentration camp guard of the *Waf-*

6. Even if ratified, there remains the separate issue of whether the U.N. Declaration would be self-executing, and whether it would vest additional rights beyond those given the defendant under the United States Constitution. *See United States v. Postal,* 589 F.2d 862, 873–84 (5th Cir.

*fen* –SS in the same league with universal principles such as those governing piracy on the high seas, *see United States v. Smith,* 18 U.S. (5 Wheat.) 153, 160–62, 5 L.Ed. 57 (1820), and acts of torture. *See Filartiga v. Pena–Irala, supra,* 630 F.2d at 882.

The defendant's claim is a quantum leap that this court is unwilling to make. *Compare Hamilton v. Regents of University of California,* 293 U.S. 245, 265, 55 S.Ct. 197, 205, 79 L.Ed. 343 (1934) (university military science course requirement not in conflict with Kellogg–Briand Peace Pact).

While, in an appropriate case, the United Nations Declaration cited by the defendant might properly supply the rule of decision to be applied to particular facts, *see Filartiga v. Pena–Irala, supra,* 630 F.2d at 880–90; *The Paquete Habana,* 175 U.S. 677, 700, 20 S.Ct. 290, 299, 44 L.Ed. 320 (1900), nothing appears in the defendant's Motion for a New Trial that vests defendant the right under international law principles to be protected from expatriation in this case. This court carefully detailed in its exhaustive trial Decision those facts and applicable legal standards that led to our judgment that defendant has voluntarily relinquished his right to claim United States citizenship.

The only tenable conclusion, therefore, is that defendant's Motion for a New Trial should be denied as to his claims under the United Nations Universal Declaration of Human Rights.

## 2. CONSTITUTIONAL CLAIMS

■ Defendant asserts that the Decision in this matter violates his rights under the United States Constitution. Specifically, defendant alleges violations of his right to a fair and speedy trial, right to confront and cross-examine the witnesses against him, due process of law and equal protection, right to effective assistance of counsel, and unlawful search and seizure.

1979); *Diggs v. Richardson,* 555 F.2d 848, 850 (D.C.Cir.1976); *People of Saipan v. U.S. Dept. of the Interior,* 502 F.2d 90, 101 (9th Cir.1974) (Trask, J., concurring); *Sei Fujii v. State,* 38 Cal.2d 718, 721–22, 242 P.2d 617, 620 (1952).

Defendant's general allegations of constitutional violations are conclusory and unsupported by a single fact or legal argument. The constitutional claims, lacking any substantiation whatsoever, are incomprehensible and this court will not fabricate a constitutional claim on the defendant's behalf. "Conclusory allegations of law, unsupported conclusions and unwarranted inferences need not be accepted as true." *Perry v. Grant*, 775 F.Supp. 821, 824 (M.D.Pa.1991); 5 Wright & Miller, *Federal Practice and Procedure* § 1286 (1990). These claims, lacking a factual and legal basis for analysis, are worthy of dismissal. For example, the defendant alleges an unlawful search and seizure. It is almost unfathomable how this court's August 25, 1993 Decision in this matter could constitute a search or a seizure, let alone a constitutional violation.

■ Moreover, most of the constitutional rights asserted by the defendant are inapplicable in a civil case. Defendant's claims of violations of his right to a fair and speedy trial, right to confront and cross-examine witnesses against him, and right to effective assistance of counsel are all Sixth Amendment claims. The protections afforded by the Sixth Amendment are not available in a civil case. *United States v. Marion*, 404 U.S. 307, 313, 92 S.Ct. 455, 459, 30 L.Ed.2d 468 (1971) ("On its face, the protection of the [6th] Amendment is activated only when a criminal prosecution has begun and extends only to those persons who have been 'accused' in the course of that prosecution."); *In re Grand Jury Matter*, 682 F.2d 61, 66 (3d Cir.1982).

■ Defendant's due process claim is similarly unavailing. In deciding this case, the court followed the appropriate standard of proof for establishing expatriation as provided in 8 U.S.C. § 1481(b), which provides that the government must demonstrate voluntariness and specific intent by a preponderance of the evidence. The court also followed § 1481(b)'s provision that the voluntariness of the expatriating conduct is presumed. *See* Decision, at 29–33. The Supreme Court has ruled that the preponderance of the evidence standard and the presumption of voluntariness are constitutionally permissible under the Due Process Clause of the Fifth Amendment. *Vance v. Terrazas*, 444 U.S. 252, 264–70, 100 S.Ct. 540, 547–50, 62 L.Ed.2d 461 (1980). Thus, this court's analysis afforded defendant the process he was due under the Constitution.

In sum, defendant's constitutional claims are entirely unsubstantiated in fact or law, and amount to an unsuccessful effort to elevate defendant's own disagreement with this court's Decision to constitutional dimensions.

### 3. DEFENDANT'S "CONTRARY TO THE EVIDENCE" CLAIMS

Defendant also asserts that a number of the court's findings in its August 25, 1993 Decision were contrary to the evidence presented at trial. Although many of the allegations presented by defendant in his Motion for New Trial are mere conclusory statements without explanation, we respond below to those claims in which the defendant provides at least some basis for his objection:

■ a. Defendant claims in paragraph 3A. of his Motion for New Trial that, contrary to the court's finding, the trial record shows defendant had made efforts to avoid service in the Romanian military. (Defendant's Motion for New Trial, p. 3.) Defendant, however, does not identify those points in the record which indicate defendant's unwillingness to enter the Romanian army. More importantly, defendant fails to signify the relevance of his claims to the court's findings. Even if defendant had made real efforts to escape entrance into the Romanian military, the court clearly found the record devoid of any evidence suggesting that defendant protested army service on the basis of his United States citizenship. (Findings of Fact, Nos. 13–15.) Coupled with the fact that defendant also admitted that he was aware that his American citizenship provided the basis for him to avoid Romanian military service, this court reasonably concluded that defendant's failure to assert such a claim as a means to avoid Romanian military service is clear evidence of defendant's intent to relinquish his United States citizenship. Decision, at 43.

b. In paragraph 3B. of defendant's Motion, he alleges that plaintiff failed to present competent evidence to support a finding that defendant knew of his right to request exemption from Romanian military service at the American Legation in Austria before he was inducted into the Romanian army. (Defendant's Motion for New Trial, p. 3.) Defendant, however, has misstated the claim. This court's Decision of August 25, 1993 does not make *any* reference in its Findings of Fact to defendant's rights regarding the American Legation in *Austria.* The Decision speaks only of defendant's awareness that the United States had a diplomatic presence in Romania. (Findings of Fact, 10.) Moreover, defendant's objection is irrelevant because defendant confuses the burden of proof in this matter. As this court already has stated, under 8 U.S.C. § 1481(b) the Government was entitled to the presumption that defendant voluntarily entered the Romanian army once it demonstrated that he indeed had served. It was then defendant's burden to rebut this presumption by introducing evidence, for example, of duress. *See* Decision, at 45, n. 18. In order to show that defendant voluntarily relinquished his United States citizenship, the Government was not under a burden to prove that defendant had the opportunity to exercise his rights at an American Legation.

c. Defendant argues in paragraph 3C. of his Motion for New Trial that Romanian law provides a basis upon which foreign persons could be required to perform Romanian army service if they failed to prove allegiance to another sovereign. Defendant again misconstrues the issue and falsely presents the evidence. While Romanian law did in fact require service in the military for those persons who failed to prove foreign citizenship, the law also provided for a one-year deferral from service for a foreigner to obtain documentation of foreign citizenship. (Findings of Fact, 14.)

Regardless, the defendant has failed to address the relevant issue in this case. Pursuant to Romanian law, the defendant had the initial burden to claim foreign allegiance. (Findings of Fact, 14.) Had defendant simply asserted his American citizenship he would have avoided service in the Romanian military for at least one year and would have been exempted from service entirely upon presentation of some documentation—as little as his birth certificate—indicating his United States citizenship. (Findings of Fact, 13–14.) There is no documentary evidence anywhere in the record, however, that defendant ever asserted to anyone in the Romanian military or American Legation that he was a United States citizen and, therefore, exempt from service. (Findings of Fact, 14.) Moreover, defendant has admitted under oath that he did not protest against Romanian army service because "being a Romanian national and living in the country, I was liable to such service." *See* Decision, at 48. Accordingly, we find no error with regard to this allegation.

d. In paragraph 3D. of his Motion, defendant claims that the court erred in failing to consider defendant's testimony that prior efforts to return to the United States by his parents were unsuccessful. Again, defendant's claim of error is utterly meritless. Defendant merely has presented this fact as true without citing to any testimony or other evidence presented at trial to support the claim. Moreover, the fact that defendant's parents may have attempted to return to the United States is irrelevant. Only defendant's actions are at issue in this case. The court already has found that defendant did not assert his United States citizenship at any time before submitting to service in the Romanian military, and thereby concluded that defendant voluntarily renounced his United States citizenship. (Findings of Fact, 13–26.).

e. In paragraph 3E. of defendant's Motion, he argues that the evidence proves that he was confused about his citizenship and that on his Romanian military records defendant identified himself as a United States citizen. This allegation was made by defendant at trial and in post-trial memoranda. The court already has held that this argument completely misstates the evidence. We agree that an issue before the court is defendant's knowledge of his American citizenship prior to his induction into the Romanian army. The evidence overwhelmingly shows

that at all times prior to his service in the Romanian army, defendant knew he was an American citizen. (Findings of Fact, 8 and 20.) Moreover, while defendant's Romanian military records indicate that he was born in the United States, there is no evidence that defendant asserted to anyone in the Romanian military that he was a United States citizen. (Findings of Fact, 14.). Accordingly, the evidence does not justify defendant's allegation of error.

■ f. In paragraph 3F. of his Motion for New Trial, defendant argues that the evidence fails to establish that defendant knew of his rights, opportunities and responsibilities as an American citizen at the time of his induction into the Romanian army. The evidence accumulated at trial clearly establishes the contrary. According to his own testimony, prior to his induction into the Romanian army defendant knew that he was an American citizen and, therefore, did not have to serve in the Romanian military. (Findings of Fact, 8 and 20.) The sole basis for defendant's claim that he did not know that his Romanian army service would effect his status as an American citizen is defendant's own self-serving statement.

The evidence established at trial provides a clear record, which supports this court's conclusion that defendant knew his Romanian military service would affect his status as a United States citizen. Defendant voluntarily returned to Romanian army service *after* Romania had declared war on the United States. With the knowledge that he was a United States citizen, and that foreign citizenship provided a basis to be excused from Romanian military service, defendant declined to assert his foreign citizenship to avoid induction into the Romanian army. *See* Decision, at 42–44. We agree with the Government that defendant's assertion lacks all credibility.

■ Defendant's claim also lacks relevance in law. *See* Decision, at 44. Knowledge that particular conduct may result in loss of citizenship is *not* a necessary element in finding the requisite intent to terminate citizenship. *Id.* The evidence adduced at trial conclusively established that defendant intended to relinquish his American citizen-

ship when he willingly entered the Romanian army. This intent is clearly demonstrated with or without proof of defendant's knowledge of the United States laws governing expatriation. *Id.*

g. In paragraph 3G. of his Motion, defendant argues that the evidence does not justify a finding that defendant committed an expatriating act under § 401(c) of the Immigration and Nationality Act of 1940 because defendant never acquired Romanian citizenship. Defendant rests his argument upon the last entry in his Romanian military record, which states that he was "DEPRIVED OF ROMANIAN CITIZENSHIP." *See* Decision, at 55. As we stated in our Decision, this statement is ambiguous, and, at best can be interpreted as showing only that prior to 1948, at which time this entry was made, defendant was a Romanian citizen. *Id.* Moreover, expert testimony introduced at trial clearly established that defendant obtained Romanian citizenship derivatively through his father. (Findings of Fact, 5.) Defendant himself admitted to his Romanian citizenship. *Id.* Accordingly, the evidence does not justify defendant's allegation of error.

h. In paragraph 3H. of his Motion for New Trial, defendant argues that the competent evidence presented at trial does not justify a finding that defendant knowingly and intentionally committed an expatriating act with the intent to relinquish his rights to United States citizenship. Defendant presents this claim as a mere conclusory fact and does not support the allegation with references to trial evidence. Moreover, the facts and law relevant to this issue have been exhaustively discussed in the trial and post-trial pleadings and memoranda, and this court carefully reviewed and reported on all claims regarding this matter in its Decision of August 25, 1993. The defendant fails to argue why this court's reasoning in its Decision does not substantiate a finding that defendant intentionally committed expatriating acts with the intent to relinquish his United States citizenship. We find, therefore, that the court's Decision is justified, and defendant's claim is meritless.

i. Finally, in paragraph 31. of the defendant's New Trial Motion, he argues that the evidence does not establish that he knew he was arrested as a Prisoner of War while held at the end of the war at Bad Aibling. Once again, defendant misses the mark in his claim of error. The trial record shows that defendant knew he was arrested and held by United States forces at Bad Aibling as a Prisoner of War. (Findings of Fact, 106.) Regardless, the relevant issue is not whether defendant knew he was arrested as a Prisoner of War. Rather, the relevant inquiry should be whether defendant knew he was arrested as a suspected war criminal. On this question, the evidence clearly demonstrates that defendant, by his own admission, knew he was arrested pursuant to the automatic arrest category authorizing the arrest of all persons who were members of the *Waffen* –SS *Totenkopfverbände. See* Decision, at 76. Moreover, defendant would have known he was still under arrest because when he was discharged as a Prisoner of War, he was not released from custody and not permitted to leave the camp. (Findings of Fact, 117.) Accordingly, we find that defendant's allegation of error is again without merit.

### 4. FINDINGS OF FACT

█ In paragraph 12 of his Motion for New Trial, defendant makes specific exceptions to the court's own findings of fact. All of defendant's exceptions amount to nothing more than contradictions of specific factual findings found in our Decision. Each finding of fact was well substantiated with specific references to the extensive record in this case, including the trial transcript, the exhibits and the parties' post-trial memoranda and briefs. While this court is satisfied that our findings of fact are both legally relevant and well grounded in the evidence presented, we will nonetheless comment upon some of defendant's objections to our findings. We do so mindful of our discretion in reviewing our fact findings, and that only manifest errors of

fact are grounds for the granting of a new trial.

Defendant lists his objections consecutively, according to the numerical designations found in our Decision. Many of the factual findings to which defendant objects are simply listed in defendant's brief. Defendant makes no additional effort to explain his objections to these findings. For those fact findings, we feel no further comment is necessary [7]. We briefly respond, however, to those portions of defendant's motion where defendant provided at least some argument concerning his exceptions to factual findings.

26–37) [8] Defendant challenges these findings, which describe the rise to power of Hitler and the Nazi Party, the outbreak of World War II, and a general description of the concentration camp system. Defendant does not deny the content of the findings, but seems to suggest that this background information is not relevant because defendant did not personally participate or assist in the concentration camp system. Since defendant does not allege that these findings constitute manifest errors of fact (indeed, he does not deny their validity) we find defendant's challenge meritless.

38, 40) Defendant challenges the estimates of the total number killed in Nazi concentration camps as unreliable. In arriving at these estimates, the court relied on the expert testimony of Dr. Sydnor. Dr. Sydnor is a scholar who has dedicated his professional career to studying and teaching German history, with a special emphasis on the Nazi program of persecution. We stated in our Decision that the testimony of Dr. Sydnor is beyond reproach, and we remain confident that Dr. Sydnor's estimates are reliable. Furthermore, while Dr. Sydnor's estimates are simply estimates and by their nature lack mathematical precision, they nonetheless demonstrate that the concentration camps were responsible for the deaths of millions of victims. We, therefore, find no manifest error in these estimates, and we question the

---

7. Specifically, defendant objects to findings 6, 8, 13, 14, 15, and 20–25 with no explanation for his objection. Absent any argument to the contrary, we can find no manifest error in any of these findings of fact.

8. The numbers used represent the numbered Finding of Fact as designated in the Opinion, and as challenged in defendant's brief.

relevancy and propriety of defendant's arguments.

41–43) Defendant challenges these findings, which discuss the role played by guards in the concentration camps. As to Findings 42 and 43, defendant already admitted to these facts when the plaintiff proposed them in its post-trial memorandum. As to Finding 41, defendant made the same relevancy objection when the plaintiff proposed this finding in its post-trial memorandum (*See* Defendant's Response to Plaintiff's Proposed Findings of Fact, at 4). The court, having already considered defendant's factual assertion, finds no manifest error in these findings of fact.

45) Defendant challenges our finding describing the training received by concentration camp guards. Defendant made the same objection when plaintiff proposed this finding in its post-trial memorandum. (*See* Defendant's Response to Plaintiff's Proposed Findings of Fact, at 5). The court, having already considered defendant's factual argument, finds no manifest error in this finding of fact.

48) Defendant challenges the finding that preventing the escape of prisoners and escorting prisoners to and from slave labor sites constituted persecution. In our Decision, we presented extensive legal and factual support for the proposition that these activities did indeed constitute persecution. (*See* Decision, at 62–65.) We find no manifest error in this finding of fact.

49–59) Defendant objects to these findings of fact which provide a general background on the conditions endured by concentration camp prisoners. Defendant made the same objection when plaintiff proposed this finding in its post-trial memorandum. (*See* Defendant's Response to Plaintiff's Proposed Findings of Fact, at 5). The court, having already considered defendant's factual argument, finds no manifest error in these findings of fact.

61, 63) Defendant objects to these findings of fact which describe defendant's voluntary enlistment and service in the *Waffen*–SS. Defendant made the same objection when plaintiff proposed this finding in its post-trial

memorandum. (*See* Defendant's Response to Plaintiff's Proposed Findings of Fact, at 6–7). The court, having already considered defendant's factual argument, finds no manifest error in these findings of fact.

65) Defendant objects to the finding regarding the conditions at and purposes of the concentration camp at Sachsenhausen. His objection is that there is no evidence that defendant knew the reasons prisoners were detained at the camp. This court has treated thoroughly the issue of defendant's personal participation in, and knowledge of, numerous acts of persecution at Sachsenhausen, as well as other concentration camps. (*See* Decision, at 64–65). We find no manifest error in this factual finding.

68–71, 73–74, 80–82, 84, 86–88, 89–92, 103, 104) Defendant challenges these findings which describe the conditions at Sachsenhausen, Trawniki, Majdanek and Hersbruck concentration camps. Again, defendant challenges the historical accuracy of Dr. Sydnor's testimony. In addition, defendant challenges the finding that he personally participated and had knowledge of the persecution which occurred at these camps. As we stated with respect to Findings 38 and 40 on page 1175 above, we are fully satisfied that there is no manifest error in the factual findings based on Dr. Sydnor's testimony. In response to defendant's second argument, we once again point to our discussion in the Decision establishing defendant's personal participation in acts of persecution (*See* Decision, at 64–65).

79) Defendant challenges the finding that Jews were imprisoned at Trawniki solely because they were Jews. This finding is based in part on the testimony of a concentration camp survivor, which the court found to be highly credible. (*See* Decision, at 28–29). It is also based on the testimony of Dr. Sydnor. We find no manifest error in this finding of fact.

114, 117) Defendant challenges these findings relating to his post-War arrest as a war crimes suspect and his knowledge of atrocities committed at the camps at which he was a guard. Defendant made the same objection when plaintiff proposed this finding in its post-trial memorandum. (*See* Defendant's Response to Plaintiff's Proposed Find-

ings of Fact, at 8–9). The court, having already considered defendant's factual argument, finds no manifest error in these findings of fact.

120) This finding of fact established that during his detention as a POW and a suspected war criminal, defendant never claimed to be a citizen of the United States. Defendant seeks to draw an inference from this finding that he failed to understand his status as a citizen of the United States. Defendant does not challenge the factual accuracy of this finding and, therefore, has presented no legal grounds for relief based on manifest error in the factual finding. In addition, defendant's argument is in direct conflict with his own testimony and our finding that defendant was clearly aware of his United States citizenship since his teenage years. (*See* Decision, at 42–45).

150–153) Defendant challenges these findings which discuss defendant's application for naturalization and his answers to certain questions on the N–400 Application. Defendant made the same objections when plaintiff proposed this finding in its post-trial memorandum. (*See* Defendant's Response to Plaintiff's Proposed Findings of Fact, at 13–17). The court, having already considered defendant's factual argument, finds no manifest error in these findings of fact.

 155–156) Defendant challenges these findings which describe defendant's representations of his citizenship and their effect on the naturalization examiner who approved his petition for naturalization. Defendant argues that the examiner should not have been misled by defendant's failure to disclose his membership in the *Waffen* –SS *Totenkopfsturmbann*. This court carefully analyzed both the law and facts regarding material omissions under 8 U.S.C. § 1451.

(*See* Decision, at 75–79). We are satisfied that defendant's representation that he was "stateless, last of Romania" and his omissions regarding his membership in the *Waffen* –SS constitute material omissions which led the naturalization examiner to approve defendant's application. We find no manifest error in these findings of fact.

### III. MOTION TO AMEND FINDINGS AND CONCLUSIONS

 Defendant also has moved for the entry of amended findings of fact and conclusions of law, pursuant to Federal Rule of Civil Procedure 52(b). This Rule permits a trial court, on motion made by a party not later than 10 days after entry of judgment, to amend its findings, make additional findings, and to amend its judgment accordingly. On motions to amend, however, the findings of fact made by the trial court are entitled to presumptive validity, and will be set aside only if they are clearly erroneous. Fed. R.Civ.P. 52(a). *See e.g., Harsco Corp. v. Zlotnicki,* 779 F.2d 906, 909 (3rd Cir.1985), *cert. denied,* 476 U.S. 1171, 106 S.Ct. 2895, 90 L.Ed.2d 982 (1986). Like a Motion for New Trial, the purpose of a motion to amend judgment is to correct manifest errors of law or fact or to present newly discovered evidence. *Id.* A motion to alter or amend the judgment should not be employed (1) to introduce evidence that was available at trial but was not proffered,[9] (2) to advance new theories, or (3) to secure a rehearing on the merits. *Kravco Co. v. Valley Forge Center Assoc.,* No. 91–4932, 1992 WL 5893, \*2, 1992 U.S.Dist. LEXIS 260, \*4–\*5 (E.D.Pa., January 8, 1992). A court should amend its findings or judgment only if errors are found that "seriously affect substantial rights or compromise the fairness of the proceedings."

---

9. Defendant attempts to introduce a document that represents a discharge of defendant by the local *Spruchkammer* (local German public prosecutor) which, according to defendant, indicates that there was no evidence of war crime activity during World War II. Defendant fails to provide the court any reason why this document was not available and proffered during the many months of discovery and trial in this matter. Accordingly, we will not consider this evidence as part of our review of defendant's motion to amend findings of fact and judgment. In any case, we note that this document is not probative of defendant's war crime activities during World War II. In fact, this document merely suggests that the German government decided without a stated justification not to pursue local prosecution of the defendant. The decision of the local German prosecutor does not refute or even address the overwhelming evidence of war crime activity by defendant.

*United States v. Bey*, 736 F.2d 891, 893 (3d Cir.1984).

In defendant's motion to amend, he improperly asks this court to adopt findings of fact which we previously have considered and either incorporated into our Decision or rejected. Each of defendant's proposed amendments to the findings of fact were presented to the court in defendant's Post–Trial Brief filed on May 18, 1993. (Defendant's Post–Trial Brief, "Statement of Facts," 2–6.) Defendant's motion to amend findings of fact, therefore, is merely a flagrant attempt to reargue issues previously decided, even after a voluminous record had been compiled and complete sets of briefs and memoranda submitted. This court severely frowns upon such practice. "[I]f a court has once rendered its best efforts to arrive at a proper solution of questions submitted, upon complete presentation, it should not be subjected to a demand to consider the same again. Otherwise, litigation would never end." *Pioneer Paper Stock Co. v. Miller Transport Co.*, 109 F.Supp. 502, 504 (D.N.J. 1953), *citing Stewart–Warner Corp. v. Levally*, 16 F.Supp. 778, 779 (N.D.Ill.1936).

Because the defendant's motion to amend or alter findings of fact is neither a vehicle for reargument, nor a forum to obtain a rehearing, and since this court already has reviewed and ruled on defendant's proposed amendments, we must deny this motion to amend findings of fact and conclusions of law.

## IV. CONCLUSION

For the foregoing reasons, defendant's motion for a New Trial And/Or Amendment of Judgment and for Amended Findings of Fact and Conclusions of Law is denied. We feel we must question the true purpose of the

1. In defendant's Supplemental Motion for a New Trial and Stay of Proceedings, defendant seeks relief under Federal Rule of Civil Procedure 60(b)(2), based on his post-trial Exhibit D1. Rule 60(b) reads:

On motion and upon such terms that are just the court may relieve a party or party's legal representative from a final judgment, order, or proceeding for the following reasons:
. . . .

motion in light of its procedural infirmities and lack of legal and factual support.

An appropriate order follows.

### *ORDER*

AND NOW, this 28th day of October, 1993, consistent with the foregoing Opinion, it is hereby **ORDERED** that:

1. Defendant, Nikolaus Schiffer's Motion for a New Trial and/or Amendment of Judgment and for Amended Findings of Fact and Conclusions of Law, filed September 4, 1993 is hereby **DENIED.**

2. Defendant, Nikolaus Schiffer's Supplemental Motion for Relief from Judgment under Rule 60(b)(2), filed October 25, 1993, is **DENIED** as MOOT.[1]

3. Defendant, Nikolaus Schiffer's Supplemental Motion for Stay, filed October 25, 1993, is **DENIED** as MOOT.

(2) newly discovered evidence which by due diligence *could not have been discovered in time to move for a new trial under Rule 59(b).* (emphasis added). As defendant filed a Motion for a New Trial on September 4, 1993 and his motion included this new evidence (*See* discussion of this evidence on page 30 of attached Opinion), the evidence was discovered in time to move for a new trial under Rule 59(b). Therefore, defendant's motion under Rule 60(b)(2) is denied as moot.