[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 12-14898

_____

D.C. Docket No. 0:08-md-01916-KAM

LILIANA MARIA CARDONA,
JOHN DOE,
ANGELA MARIA HENAO MONTES, et al.,

Plaintiffs – Appellees - Cross Appellants,

ADANOLIS PARDO LORA,
AIDEE MORENO VALENCIA,
ALBINIA DELGADO, et al.,

Plaintiffs – Appellees,

versus

CHIQUITA BRANDS INTERNATIONAL, INC.,
an Ohio corporation,
CHIQUITA FRESH NORTH AMERICA LLC,
a Delaware corporation,

Defendants - Appellants - Cross Appellees.

_____

Appeals from the United States District Court
for the Southern District of Florida

_____

(July 24, 2014)

Before MARTIN, FAY, and SENTELLE[*], Circuit Judges.

SENTELLE, Circuit Judge:

Over four thousand Colombians brought actions against Appellant Chiquita Brands International, Inc., and Chiquita Fresh North LLC (collectively, "Chiquita"), alleging claims involving torture, personal injury, and death under the Torture Victims Protection Act and the Alien Tort Statute. The district court in a series of orders denied motions to dismiss. Concluding that there were controlling questions of law that could be efficiently decided before further litigation, the district court certified those questions to us. On interlocutory review, we determine that the complaints do not state claims within the jurisdiction of the United States courts, and we reverse the denials of motions to dismiss and remand the matter for the entry of judgments of dismissal.

## The Litigation

Because our ultimate disposition is not dependent on specificity of fact, we will only briefly review the history of the case. The plaintiffs filed lawsuits alleging liability on the part of Chiquita for engaging in concert of action with paramilitary forces in Colombia, including acts that plaintiffs alleged to constitute torture and to have resulted in personal injury and death. Plaintiffs asserted that

---

[*] Honorable David Bryan Sentelle, United States Circuit Judge for the District of Columbia, sitting by designation.

2

the courts of the United States had jurisdiction under the Alien Tort Statute, 28 U.S.C. § 1350 ("ATS"), and the Torture Victims Protection Act, 28 U.S.C. § 1350 note ("TVPA"). After all the cases came under the control of one district judge, motions practice proceeded.

Appellant Chiquita filed motions to dismiss. The district court in several opinions considered those motions and other questions and ultimately denied the motions to dismiss. However, the court granted defendants' motion for certification of certain controlling questions for interlocutory review under 28 U.S.C. § 1292(b). Pursuant to the authority of that certification, Chiquita timely petitioned this court for permission to appeal. On September 27, 2012, we granted that petition.

The questions certified for review are as follows:

1. Whether the "state action" element of claims for extrajudicial killing and torture brought under the ATS and TVPA requires Plaintiffs to plead facts establishing government involvement in the specific torture and killings alleged in Plaintiff's complaints.

2. Whether Plaintiffs, in alleging secondary liability for claims for war crimes, must plead facts showing a nexus between the Colombian civil war and the specific torture and killings for which Plaintiffs seek redress.

3. Whether Plaintiffs have adequately pled a claim for crimes against humanity, the elements of which have not been defined by any federal court of appeals.

4. Whether the civil tort laws of Florida, New Jersey, Ohio, and the District of Columbia apply to the extraterritorial conduct of

3

Colombian paramilitaries against Colombian civilians that occurred inside Colombia as part of Colombia's civil war.

Because we conclude that neither this court nor the district court has jurisdiction over the action, we ultimately will not answer those specific questions, but will dispose of the case for the reasons and in the manner set forth below.

## Disposition

Although we accepted the interlocutory appeal for the review of specified questions, we are not limited to the address of those specific issues. "[T]he appellate court may address any issue fairly included within the certified order because 'it is the *order* that is appealable, and not the controlling question identified by the district court.'" *Yamaha Motor Corp., USA v. Calhoun*, 516 U.S. 199, 205 (1996) (emphasis in original) (quoting 9 J. Moore and B. Ward, Moore's Federal Practice § 110.25[1] at 300 (2d ed. 1995)). More fundamentally, no matter how a case comes before us, the court has the authority and the duty to determine its own jurisdiction. *See, e.g.*, *United States v. Shipp*, 203 U.S. 563, 573 (1906).

As we noted above, plaintiffs asserted jurisdiction in the district court under the Torture Victims Protection Act and the Alien Tort Statute. Subsequent to the district court's denial of the motions to dismiss and to its certification order of March 2012, the TVPA claims have become undeniably unviable. On April 18, 2012, barely three weeks after the entry of the certification order, the Supreme Court announced its decision in *Mohamad v. Palestinian Authority*, ___ U.S. ___ ,

4

132  S.Ct. 1702 (2012).  In *Mohamad*, a unanimous Court held that the TVPA "authorizes liability solely against natural persons."  ___ U.S. at ___, 132 S.Ct. at 1708.  The defendant-appellants are Chiquita Brands International, Inc., and Chiquita Fresh North America, LLC.  Neither is a natural person.  The claims under the TVPA must be dismissed.

Unfortunately for the plaintiff-appellees, the Supreme Court has also acted with respect to the ATS during the pendency of this appeal.  In *Kiobel v. Royal Dutch Petroleum Co.*, ___ U.S. ___, 133 S.Ct. 1659 (2013), the High Court considered a case in some ways parallel to the one before us.  The *Kiobel* plaintiffs sued a corporate defendant under the ATS, alleging the cooperation of the corporation with the government of Nigeria in the commission of torts allegedly within the compass of that statute.  The statute provides that "the district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States."  28 U.S.C. § 1350.  The *Kiobel* plaintiffs alleged acts committed by Nigeria and the corporate defendant "in violation of the law of nations" in the territory of Nigeria. *Kiobel*, 133 S.Ct. at 1663.  Similarly, plaintiff-appellants in this case alleged acts by Chiquita in conjunction with paramilitary actors within the territory of Colombia.

In *Kiobel*, the Supreme Court reviewed the history of the ATS, and we see no reason to rehash it here. We can dispose of the claims that are before us simply by applying the conclusion of the *Kiobel* Court:

> We therefore conclude that the presumption against extraterritoriality applies to claims under the ATS, and that nothing in the statute rebuts that presumption. "[T]here is no clear indication of extraterritoriality here," and petitioners' case seeking relief for violations of the law of nations occurring outside the United States is barred.

___ U.S. at ___, 133 S.Ct. at 1669 (quoting *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 264 (2010)).

The Court noted in *Kiobel* that "all the relevant conduct took place outside the United States." *Id.* All the relevant conduct in our case took place outside the United States. The Court further noted that "even where the claims touch and concern the territory of the United States, they must do so with sufficient force to displace the presumption against extraterritorial application." *Id.* Plaintiff-appellants attempt to anchor ATS jurisdiction in the nature of the defendants as United States corporations. Corporate defendants in *Kiobel* were not United States corporations, but were present in the United States. The Supreme Court declared that "[c]orporations are often present in many countries, and it would reach too far to say that mere corporate presence suffices." *Id.* The distinction between the corporations does not lead us to any indication of a congressional intent to make the statute apply to extraterritorial torts. As the Supreme Court said in *Kiobel*, "[i]f

6

Congress were to determine otherwise, a statute more specific than the ATS would be required." *Id.*   There is no other statute.  There is no jurisdiction.

Before concluding, we pause to respond briefly to the thoughtful comments of our dissenting colleague.  The short answer to her concerns is expressed in the application of *Kiobel* to the facts of this case.  Any tort here, whether styled as torture or under some other theory, occurred outside the territorial jurisdiction of the United States.  The ATS contains nothing to rebut the presumption against extraterritoriality.  We further observe that to apply the ATS to the allegations before us would be inconsistent with the Supreme Court's earlier holding in *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004).  *Sosa* makes it clear beyond cavil that the ATS created no causes of action but is purely jurisdictional.  "[A]t the time of enactment the jurisdiction enabled federal courts to hear claims in a very limited category defined by the law of nations and recognized at common law." *Id.* at 712. It is not nearly so clear, as our dissenting colleague believes, that acts described as "torture" come within the jurisdiction created by the statute over "a tort only, committed in violation of the law of nations or a treaty of the United States."  28 U.S.C. § 1350.

As recognized by the *Sosa* Court, "[i]n the years of the early Republic, this law of nations comprised two principal elements:"  (1) "the general norms governing the behavior of national states with each other" (executive and

7

legislative in nature), and (2) "judge-made law regulating the conduct of individuals situated outside domestic boundaries and consequently carrying an international savor" (which are, according to Blackstone, mercantile questions arising from the customary practices of international traders and admiralty). 542 U.S. at 714–15. Additionally, the *Sosa* Court noted that "[t]here was . . . a sphere in which these rules binding individuals for the benefit of other individuals overlapped with the norms of state relationships" (Blackstone mentioned three in specific: "violation of safe conducts, infringement of the rights of ambassadors, and piracy"). *Id.* at 714–15 (citing 4 W. Blackstone, Commentaries on the Laws of England 68 (1769)).

Nothing in the complaint before us falls within Blackstone's three categories. It is true that a majority of the Supreme Court recognized the possibility that a court might recognize a cause of action outside the law of nations as it existed at the time of the enactment of the ATS, but the Court emphasized "that a decision to create a private right of action is one better left to legislative judgment in the great majority of cases." *Id.* at 727. Therefore, the Court found itself "reluctant to infer . . . a private cause of action where the statute does not supply one expressly." *Id.* Even aside from the presumption against extraterritoriality—not overcome by the

8

allegations before us—*Sosa* counsels against recognizing a tort not previously recognized as within ATS jurisdiction.

It is true, as our colleague declares, that at least one circuit in a case decided long before the Supreme Court spoke in *Sosa* or *Kiobel* did conclude that extraterritorial torture fell within the law-of-nations category of the ATS. *Filartiga v. Pena-Irala*, 630 F.2d 876 (2d Cir. 1980); *see also Al Shimari v. CACI Premier Tech. Inc.*, 2014 WL 2922840 (4th Cir. June 30, 2014). However, this is by no means a unanimous conclusion of the circuits. In *Saleh v. Titan Corp.*, 580 F.3d 1 (D.C. Cir. 2010), the District of Columbia Circuit rejected the claim that acts of abuse and torture inflicted upon Iraqi national detainees by private government contractors working for the United States military in Iraq violated settled norms of international law and thus were actionable under the ATS.

The *Saleh* court noted that "[a]lthough torture committed by a state is recognized as a violation of a settled international norm, that cannot be said of private actors." *Id.* at 15. *Saleh*, unlike *Filartiga*, came after the Supreme Court's pronouncements in *Sosa*. That same circuit reached a similar conclusion in *Ali v. Rumsfeld*, 649 F.3d 762 (D.C. Cir. 2011). Even before the *Sosa* decision, in *Sanchez-Espinoza v. Reagan*, 770 F.2d 202 (D.C. Cir. 1985), that court held that actions taken by executive officials, in their private capacity, supporting forces bearing arms against the government of Nicaragua did not violate any treaty or

9

"customary international law" so as to confer original jurisdiction of a suit under the ATS. *Id.* at 206.

Again, we reiterate that the ATS does not apply extraterritorially. The torture, if the allegations are taken as true, occurred outside the territorial jurisdiction of the United States. As we emphasized above, to the extent the possibility of an exception to the presumption against extraterritoriality exists, the *Kiobel* Court made it clear that such exception could occur only, if at all, "where the claims touch and concern . . . the United States . . . with sufficient force to displace the presumption against extraterritorial application." *Kiobel*, ___ U.S. at ___, 133 S.Ct. at 1669. There is no allegation that any torture occurred on U.S. territory, or that any other act constituting a tort in terms of the ATS touched or concerned the territory of the United States with any force.

Finally, we consider our colleague's humane observation that "the United States would fail to meet the expectations of the international community were we to allow U.S. citizens to travel to foreign shores and commit violations of the laws of nations with impunity." Even assuming the correctness of the assumption that the present complaint states violations of the law of nations, the dissent's observation is not relevant to our determination in this case. Certainly, it may state desirable goals of foreign policy. But the determination of foreign policy goals and the means to achieve them is not for us. "The conduct of the foreign relations

of our government is committed by the Constitution to the executive and legislative—'the political'—departments of the government, and the propriety of what may be done in the exercise of this political power is not subject to judicial inquiry or decision." *Oetjen v. Cent. Leather Co.*, 246 U.S. 297, 302 (1918). This principle is most germane to the question of whether we should create a cause of action within the ATS jurisdiction against the caution of *Sosa*. In *Sosa*, the Supreme Court expressly stated, "a private right of action is better left to legislative judgment in the great majority of cases." 542 U.S. at 727. While this observation was prompted by generally applicable concerns with reference to the legislative function, the Supreme Court went on to note the particular applicability to the area in which we now act. "[T]he potential implications for the foreign relations of the United States of recognizing such causes should make courts particularly wary of impinging on the discretion of the Legislative and Executive branches in managing foreign affairs." *Id.*

The *Sosa* Court further cautioned against judicial creation of such causes of action, observing "[w]e have no congressional mandate to seek out and define new and debatable violations of the law of nations, and modern indications of congressional understanding of the judicial role in the field have not affirmatively encouraged greater judicial creativity." *Id.* at 728. The *Sosa* Court also recognized that the Torture Victim Protection Act, *supra*, provides a basis for "federal claims

11

of torture and extrajudicial killing," but as we observed above, that legislation does not extend to the complaints before us. *See id.* The noble goals expressed in our dissenting colleague's observation should perhaps guide the foreign policy of the United States, but that is not for us to say. Certainly, noble goals cannot expand the jurisdiction of the court granted by statute.

As we observed above, there is no other statute. There is no jurisdiction.

## Conclusion

For the reasons set forth above, we reverse the orders denying the motions to dismiss and remand this case for dismissal.

MARTIN, Circuit Judge, dissenting:

I respectfully dissent.  Last year, in Kiobel v. Royal Dutch Petroleum Co., ___ U.S. ___, 133 S. Ct. 1659 (2013), the Supreme Court gave its most recent guidance in the ongoing struggle to define the contours of the Alien Tort Statute (ATS).[1]  In that case, the Supreme Court applied the presumption against extraterritoriality to the ATS claims presented.  Id. at 1669.  The presumption against extraterritorial application is a canon of statutory interpretation, teaching that a statute which gives no clear indication that it applies extraterritorially, does not.  Id. at 1664.  Significantly however, the Kiobel court left the door open to the extraterritorial application of the ATS for claims made under the statute which "touch and concern the territory of the United States . . . with sufficient force to displace the presumption."  Id. at 1669.

The Kiobel opinion offers little assistance about what kinds of domestic connections would be necessary to overcome the presumption against extraterritoriality.  But I see this case as one which does just that, for at least two reasons.  First, the primary defendant in this case is Chiquita Brands International (Chiquita), a corporation headquartered and incorporated within the territory of the United States.  Second, these plaintiffs are not seeking to hold Chiquita liable for conduct that took place on foreign soil.  Rather, they allege that Chiquita

---

[1] The Alien Tort Statute was "[p]assed as a part of the Judiciary Act of 1789."  Kiobel, 133 S. Ct. at 1663.

participated in a campaign of torture and murder in Colombia by reviewing, approving, and concealing a scheme of payments and weapons shipments to Colombian terrorist organizations, all from their corporate offices in the territory of the United States.[2]  For these reasons, I believe that we have jurisdiction to consider the plaintiffs' claims.

## I.

First, the plaintiffs' claims "touch and concern" the territory of the United States because they allege violations of international law by an American national. Quite different from Kiobel, the plaintiffs in this case do not rely on Chiquita's "mere corporate presence" in the United States to justify ATS jurisdiction.  Id. Chiquita is incorporated in New Jersey and headquartered in Ohio.  Principles of international law as well as historical materials tell us why this is a crucial difference and is ultimately dispositive of the case we consider here.  Indeed, I am persuaded that the ATS was intended to provide a remedy for extraterritorial violations of the law of nations like those alleged to have been committed here by United States nationals like Chiquita.

To begin with, it is a fundamental principle of international law that every State has the sovereign authority to regulate the conduct of its own citizens,

---

[2] We consider a jurisdictional challenge here.  Thus, at this stage of the proceeding, we accept the facts alleged in the plaintiffs' complaints as true.  McElmurray v. Consolidated Gov't of Augusta-Richmond Cnty., 501 F.3d 1244, 1251 (11th Cir. 2007).

14

regardless of whether that conduct occurs inside or outside of the State's territory. See Restatement (Third) of The Foreign Relations Law of the United States § 402(2) (1987) ("[A] state has jurisdiction to prescribe law with respect to . . . the activities, interests, status, or relations of its nationals outside as well as within its territory."). This has been true from the beginnings of our union, and at the time the ATS was first enacted. See Rose v. Himely, 8 U.S. (4 Cranch) 241, 279 (1808) (observing that beyond its own territory, the laws of a country "can only affect its own subjects or citizens"); The Apollon, 22 U.S. (9 Wheat.) 362, 370 (1824) ("The laws of no nation can justly extend beyond its own territories, except so far as regards its own citizens."). In keeping with this fundamental principle, the same foreign governments who urged the Supreme Court to dismiss the claims in Kiobel also acknowledged that an ATS claim would have "a sufficiently close connection" with the United States when the violation of the law of nations was committed by a United States citizen. See Kiobel, Brief for Gov't of the Kingdom of the Netherlands et al. as Amici Curiae, 14. Indeed, the United Kingdom, the Netherlands, and Switzerland all take a similar approach, disallowing extraterritorial torts except for claims asserted against their own nationals. See id. at 18–23, 21 n.32.

More fundamentally, the framers of the ATS gave voice to the idea that the United States had not only the authority, but also international legal obligations to

provide a forum for aliens to receive compensation for the most egregious offenses committed by Americans in other countries. Speaking on the law of nations, William Blackstone stated that "where the individuals of any state violate this general law, it is then the interest as well as duty of the government under which they live, to animadvert upon them with a becoming severity, that the peace of the world may be maintained." 4 William Blackstone, Commentaries on the Laws of England 68 (1769); see also Emmerich de Vattel, The Law of Nations or the Principles of Natural Law Applied to the Conduct and to the Affairs of Nations and of Sovereigns, bk. II, ch. VI § 77 (1758) (Charles G. Fenwick trans., 1916) ("A sovereign who refuses to repair the evil done by one of his subjects, or to punish the criminal, or, finally, to deliver him up, makes himself in a way an accessory to the deed, and becomes responsible for it."). The United States would fail to meet the expectations of the international community were we to allow U.S. citizens to travel to foreign shores and commit violations of the law of nations with impunity. See Filartiga v. Pena-Irala, 630 F.2d 876, 890 (2d Cir. 1980) ("[F]or purposes of civil liability, the torturer has become—like the pirate and slave trader before him—hostis humani generis, an enemy of all mankind.").[3]

---

[3] The majority observes that our sister circuits have not unanimously allowed ATS plaintiffs to allege causes of action for extraterritorial torture after the Supreme Court's decision in Sosa v. Alvarez-Machain, 542 U.S. 692, 124 S. Ct. 2739 (2004). I do not read the majority opinion as casting doubt on this Court's post-Sosa jurisprudence holding that torture is a proper claim that may be brought under the ATS. See Romero v. Drummond Co., 552 F.3d 1303, 1316 (11th Cir. 2008) (explaining that claims of torture or extrajudicial killing can be brought under the ATS or

16

That the framers of the ATS contemplated a remedy for torts committed by American citizens abroad is also supported by an opinion authored by Attorney General William Bradford in 1795.  See Breach of Neutrality, 1 Op. Att'y Gen. 57 (1795).  In this opinion, Attorney General Bradford was responding to concerns about several United States citizens who "voluntarily joined, conducted, aided, and abetted a French fleet" in attacking the British Colony of Sierra Leone, as well as "plundering or destroying the property of British subjects on that coast."  Id. at 58. Attorney General Bradford had "no doubt" that the victims in Sierra Leone "who have been injured by these acts of hostility have a remedy by a civil suit in the courts of the United States; jurisdiction being expressly given to these courts in all cases when an alien sues for a tort only, in violation of the laws of nations, or a treaty of the United States."  Id. at 59.

I recognize that the Kiobel Court was not persuaded that Attorney General Bradford understood the ATS to apply to every extraterritorial violation of the law of nations, irrespective of the wrongdoer's nationality.  See 133 S. Ct. at 1668.  But the Bradford opinion is at least strong evidence that the ATS provides a remedy for extraterritorial violations of the laws of nations committed by United States citizens.  Just as the British colonists in Sierra Leone could sue their American

---

the Torture Act); Aldana v. Del Monte Fresh Produce, N.A., 416 F.3d 1242, 1250 (11th Cir. 2005) ("Torture is actionable under the Alien Tort Act, but only if the conduct is committed in violation of the laws of nations." (quotation marks omitted)).

17

attackers in 1795 under the ATS, the Colombian plaintiffs here should be allowed to hold an American corporation liable for its participation in a campaign of torture and extrajudicial killings in Colombia.

II.

Another distinction between Kiobel and the case now before us is the plaintiffs here do not seek to hold Chiquita liable for any of its conduct on foreign soil. See id. Critically, the plaintiffs instead have alleged that Chiquita's corporate officers reviewed, approved, and concealed payments and weapons transfers to Colombian terrorist organizations from their offices in the United States with the purpose that the terrorists would use them to commit extrajudicial killings and other war crimes.

This is not, therefore, a case where a defendant is being haled into court under the ATS exclusively for actions that took place on foreign soil. See, e.g., Kaplan v. Central Bank of Islamic Rep. of Iran, 961 F. Supp. 2d 185, 205 (D.D.C. 2013) (dismissing claims under Kiobel because "the attacks were allegedly funded by Iran, launched from Lebanon, and targeted Israel"). Neither is this a case in which plaintiffs are seeking to circumvent the Kiobel presumption by holding an American company vicariously liable for the unauthorized actions of its subsidiaries overseas. See, e.g., Balintulo v. Daimler AG, 727 F.3d 174, 192 (2d Cir. 2013) (holding that the Kiobel presumption is not displaced where an

18

American corporation is vicariously liable for actions taken within South Africa by a South African subsidiary).  Rather, the plaintiffs seek to hold Chiquita liable for violations of international law it committed within the territory of the United States.

My views are in keeping with a number of trial court and appeals court decisions, post-Kiobel, finding the "touch and concern" test satisfied when a defendant aids and abets overseas torts from within the United States.  See Al Shimari v. CACI Premier Tech., Inc., 2014 WL 2922840, at *12 (4th Cir. June 30, 2014) (finding that presumption was displaced in part because CACI's managers in the United States gave tacit approval to the acts of torture, attempted to cover up the misconduct, and encouraged it); Sexual Minorities Uganda v. Lively, 960 F. Supp. 2d 304, 323–24 (D. Mass. 2013) (finding that the presumption was displaced because the defendant was a resident of the United States and provided assistance to an overseas campaign of persecution from the United States); Mwani v. Laden, 947 F. Supp. 2d 1, 5 (D.D.C. 2013) (holding that a terrorist attack that (1) was plotted in part within the United States, and (2) was directed at a United States Embassy and its employees displaced the presumption); Krishanti v. Rajaratnam, 2014 WL 1669873, at *10 (D.N.J. Apr. 28, 2014) ("The Rajaratnam Defendants focus on the fact that all of the harm to Plaintiffs occurred in Sri Lanka.  This argument would hold weight if the Plaintiffs were suing the LTTE for the actions it

19

took in Sri Lanka. However, Plaintiffs are instead suing the Rajaratnam

Defendants for their alleged actions that occurred within the United States."); see

also Du Daobin v. Cisco Sys., Inc., ___ F. Supp. 2d ___, 2014 WL 769095, at *9

(D. Md. Feb. 24, 2014) (observing that Kiobel may be distinguishable because (1)

"Cisco is an American company"; and (2) plaintiffs alleged that Cisco's actions

"took place predominantly, if not entirely, within the United States"). Like these

courts, I conclude that the plaintiffs' claims here sufficiently "touch and concern"

the territory of the United States because they allege that Chiquita violated

international law from within the United States by offering substantial assistance to

a campaign of violence abroad.

III.

In sum, I do not read Kiobel to be an impediment to providing a remedy to

civilians harmed by a decades-long campaign of terror they plainly allege to have

been sponsored by an American corporation. Again, these plaintiffs do not seek

relief for the offenses of a foreign defendant on foreign soil. These plaintiffs seek

relief in a United States court for violations of international law committed by

United States citizens while on United States soil. Certainly, these extraterritorial

claims "touch and concern the territory of the United States" with great force. By

failing to enforce the ATS under these circumstances, I fear we disarm innocents

against American corporations that engage in human rights violations abroad. I

20

understand the ATS to have been deliberately crafted to avoid this regrettable result.

For these reasons, I respectfully dissent.